**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VALUE DRUG COMPANY, on behalf of itself and others similarly situated,<br><br>       *Plaintiff*,<br><br>   v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LTD.; TEVA PHARMACEUTICALS USA, INC.; TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC.; NORTON (WATERFORD) LTD.; and AMNEAL PHARMACEUTICALS, INC.,<br><br>       *Defendants*. | _____ Civ. _____ (___)<br><br>JURY TRIAL DEMANDED<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................6

II.     PARTIES ......................................................................................................9

III.    JURISDICTION AND VENUE ....................................................................10

IV.     CLASS ACTION ALLEGATIONS ..............................................................11

V.      INDUSTRY BACKGROUND......................................................................13

      A.   The Federal Drug Laws Speed Generic Drug Availability By
          (i) Allowing Generic Drugmakers To File Abbreviated Drug Applications and
          (ii) Streamlining Patent Disputes...................................................15

           1.   In the Hatch-Waxman Amendments, Congress created a streamlined,
                abbreviated approval process for generic drugs. ........................15

           2.   The Hatch-Waxman Amendments streamlined patent
                dispute resolution........................................................................17

                i.   The plain language of the Hatch-Waxman Amendments
                     limits Orange Book listings to patents that claim the drug
                     or a method of using the drug for which the applicant submitted
                     the application. ...........................................................17

                ii.  The FDA's implementing regulations limit drug patents to
                     those that claim the drug substance or a drug product containing
                     the drug substance. ....................................................19

                iii. In 2003, the FDA amended its Orange-Book-listing regulations
                     in response to improper listings....................................20

                  iv.  In 2020, Congress cracked down on continued listing abuse........24

                v.   Brand-name drugmakers, including Teva, still tried to change
                     the rules. .................................................................25

                  vi.  The statutory and regulatory rules for Orange Book listings
                     provide a very simple rule. .........................................27

            3.   The Hatch-Waxman Amendments require would-be generic companies
                to address each Orange-Book-listed patent. .............................28

           4.   Hatch-Waxman patent certifications may lead to litigation. ....................29

           5.   If a brand-name drugmaker has a reasonable, good-faith  basis to
                 believe its patents are valid and would be infringed, it may sue. ..............30

B.     Brand-Name Drugmakers Can Enforce Patents That Are Not Listed In The Orange Book.................................................................................................31

C.     Generic-Drug Availability Translates Into Substantial Savings. ..........................32

D.     Brand Companies Seeking To Unlawfully Prolong Their Monopoly Have Developed Ways To Abuse The Hatch-Waxman System And Leveraged Them To Delay Affordable Generic Drugs.........................................................32

      1.     Product hops. .........................................................................................33

      2.     Wrongful Orange Book listings..............................................................33

      3.     Reverse payment agreements ..................................................................35

VI.     FACTUAL BACKGROUND ...........................................................................................36

A.     QVAR Was An Expensive Brand-Name Asthma Medication...............................37

      1.     3M, not Teva nor Norton, invented QVAR...............................................37

      2.     3M, not Teva or Norton, incurred the expense or burden of obtaining FDA approval for QVAR. .........................................................................38

      3.     After winning FDA approval, 3M submitted five patents for listing in the Orange Book — even though two of the patents did not claim QVAR. .........................................................................................39

      4.     Through a product license and a corporate acquisition, Teva became the owner of the QVAR NDA and original QVAR patents. ..........................41

      5.     Neither Teva nor Norton invented metered dose inhalers........................42

      6.     Neither Teva nor Norton invented the concept of a counter on a metered dose inhaler.................................................................................42

B.     As The Original QVAR Patents Approached Expiry, Teva Engaged In An Overarching Anticompetitive Scheme. ..................................................................43

      1.     January - August 2014: Teva added an unnecessary dose counter invented by Norton to its QVAR product....................................................44

      2.     August 2014 - November 2016: Teva wrongfully lists device- only patents in the Orange Book as claiming the drug product QVAR. ...........45

          i.     Teva wrongfully caused the '627 patent to be listed in the Orange Book as a QVAR drug product patent. ..............................46

ii.     Teva wrongfully caused the '289 patent to be listed in the Orange Book as a QVAR drug product patent. ............................47

3.    October 2016 - February 2018: Teva executed a hard-switch product hop to prevent competition. ........................................................48

4.    August 2017 - present: Teva improperly listed numerous patents in the Orange Book to block competition to QVAR Redihaler. ..........................49

i.     Teva wrongfully caused the '627 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............49

ii.    Teva wrongfully caused the '260 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............50

iii.   Teva wrongfully caused the '712 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............51

iv.   Teva wrongfully caused the '476 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............52

v.    Teva wrongfully caused the '509 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............53

vi.   Teva wrongfully caused the '510 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............54

vii.  Teva wrongfully caused the '156 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............55

viii. Teva wrongfully caused the '512 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............56

ix.   Teva wrongfully caused the '808 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............57

x.    After years of obtaining patents and improperly listing them in the Orange Book Teva may have finally gotten one right.........58

xi.   Teva wrongfully caused the '889 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. ............60

xii.  Teva caused the '888 patent to be listed in the Orange Book as claiming QVAR Redihaler. ...........................................................61

xiii. Teva resumed listing improper patents, wrongfully causing the '637 and '643 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent. .....................................................62

5.      Despite Teva's hard-switch product hop and the thicket of wrongful patent listings it constructed around QVAR Redihaler, it still faced the risk of generic competition. ...................................................68

6.      November 2018 - present: Teva prevented generic QVAR competition by listing an additional 7 device-only patents in the Orange Book as QVAR drug product patents. ...................................................69

        i.      Teva wrongfully caused the '587 patent to be listed in the Orange Book as a QVAR drug product patent. ............................70

        ii.     Teva wrongfully caused the '509 patent to be listed in the Orange Book as a QVAR drug product patent. ............................71

        iii.    Teva wrongfully caused the '510 patent to be listed in the Orange Book as a QVAR drug product patent. ............................71

        iv.     Teva wrongfully caused the '156 patent to be listed in the Orange Book as a QVAR drug product patent. ............................72

        v.      Teva wrongfully caused the '512 patent to be listed in the Orange Book as a QVAR drug product patent. ............................73

        vi.     Teva wrongfully caused the '808 patent to be listed in the Orange Book as a QVAR drug product patent. ............................74

        vii.    Teva wrongfully caused the '889 patent to be listed in the Orange Book as a QVAR drug product patent. ............................74

7.      January 2020: a generic company filed an ANDA, seeking approval to sell an affordable generic version of QVAR— but Teva does not sue. ....75

8.      February 2020: Teva defies the Orange-Book listing rule announced by the First Circuit. ...................................................76

9.      Spring 2020: two other generic applicants— Cipla and Aurobindo — filed ANDAs, seeking approval to sell QVAR. ...................................79

        i.      Cipla Ltd. filed an ANDA, and notified Teva that it had filed paragraph IV certifications as to each of the improperly listed QVAR patents. ...................................................79

        ii.     Aurobindo Pharma Ltd. filed an ANDA, and notified Teva that it had filed paragraph IV certifications as to each of the improperly listed QVAR patents. ...................................................79

10.     August 2020 - present: Teva institutes and maintains patent litigation against Cipla and Aurobindo. ...................................................80

iv

i.      All of the claims Teva asserted in the *Cipla* and *Aurobindo* litigations claimed an inhaler device, or just a portion of an inhaler device.............................................................................81

ii.     Neither Cipla's nor Aurobindo's proposed inhaler devices infringed Teva's and Norton's device-only patents. ....................87

iii.    If the claims in Teva's device patents were read broadly enough to claim Cipla's and Aurobindo's products, then the patents would be invalid over prior art. ...................................88

iv.     Teva's infringement arguments were not in good faith and intended only to delay competition. ...............................................89

v.      Teva's litigation tactics were focused on delay, not success.........90

11.    Date unknown: Teva entered into an agreement with Amneal to delay generic QVAR competition for an unknown amount of time. .................94

12.    November - December 2022: Teva takes Cipla to trial and settles with Aurobindo. ..................................................................................................98

13.    Teva plans to prolong its unlawful monopoly even further with a second product hop. ....................................................................................101

VII.    EFFECTS OF THE SCHEME ON COMPETITION AND DAMAGES TO THE PLAINTIFF AND THE CLASS ....................................................................102

VIII.   MARKET POWER AND MARKET DEFINITION .....................................103

IX.     MARKET EFFECTS...........................................................................................105

X.      ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE .................108

XI.     CLAIMS FOR RELIEF.......................................................................................108

XII.    JURY DEMAND...................................................................................................111

XIII.   PRAYER FOR RELIEF ......................................................................................112

## I.    INTRODUCTION

1.    Plaintiff Value Drug Company, on behalf of itself and all others similarly situated, for its complaint brought under Sections 4 of the Clayton Act, 15 U.S.C. §§ 15(a), for injuries sustained from violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, by Defendants Teva Pharmaceutical Industries Ltd.; Teva Pharmaceuticals USA, Inc.; Teva Branded Pharmaceutical Products R&D, Inc.; And Norton (Waterford) Ltd (collectively, "Teva" or "Defendants"), allege as follows based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

2.    The defendants in this action, Teva Branded Pharmaceuticals R&D, Inc.  and its affiliates, embarked on a nearly decade-long (and continuing) anticompetitive scheme to delay generic competition for QVAR, its blockbuster line of brand name asthma inhalers.

3.    QVAR is a drug-device combination: an asthma medication called beclomethasone dipropionate HFA placed into an inhaler device. In the mid-to late2000s, Teva acquired the rights to QVAR, a medication that millions of people rely on to prevent life-threatening asthma attacks.

4.    QVAR's lawful period of patent exclusivity was set to expire in July 2015. But that was too soon for Teva. So Teva perpetrated a full panoply of anticompetitive delay tactics that both collectively and individually violate the antitrust laws to extend its exclusivity and continue charging astronomical prices.

5.    *First*, as patent expiry neared, Teva submitted two device patents for listing in the U.S. Food and Drug Administration's ("FDA") *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book") that did not belong there because they did not claim QVAR's drug product (beclomethasone dipropionate HFA). These improper listings allowed Teva to file patent litigation against would-be generic competitors to

6

automatically block their market entry for 30 months.

6.      *Second*, Teva executed an anticompetitive "product hop" — i.e., making an unrequired change to a mechanical aspect of the inhaler that delivered the brand drug product to impede generic substitution at the pharmacy counter. Teva obtained FDA approval to change QVAR's inhaler device so that it could place QVAR's drug product (beclomethasone dipropionate HFA) into a new device called the QVAR Redihaler and stop selling the original QVAR product.  In doing so, Teva stifled would-be generic competitors to QVAR because the drug laws do not allow for generic substitution of a given drug-device combination unless the generic is approved for that specific drug-device combination. As a result, QVAR generic equivalents could not be substituted for QVAR Redihaler. Nor could they be substituted for QVAR because Teva pulled it from the market.

7.      *Third*, Teva listed in the Orange Book twelve patents that Teva told the FDA, under penalty of perjury, claimed the QVAR Redihaler drug product (beclomethasone dipropionate HFA) when most did not. In fact, Teva did not obtain and submit a patent that (if valid and if applicable) could qualify as an Orange Book listing for the QVAR Redihaler until almost three years after the FDA approved the product. But by improperly submitting for listing other non-qualifying device patents, Teva ensured it could preemptively file patent litigation to automatically block would-be generic competitors from entering the market during that initial three-year period of time.

8.      *Fourth*, despite having pulled the original QVAR from the market as part of its anticompetitive product hop to QVAR Redihaler described above, Teva subsequently submitted seven patents for listing in the Orange Book that the company wrongfully represented claimed the original QVAR drug product.. Yet none of the patents that Teva submitted for listing in the

Orange Book for the now-discontinued QVAR drug product claimed beclomethasone dipropionate in combination with an inhaler device and were, therefore, improperly listed. Teva listed these patents to force three would-be competitors to risk patent litigation that would preemptively block them from entering the market with the original QVAR product.

9.     *Fifth*, Teva engaged in patent litigation against two of the three would-be competitors to invoke the mandatory 30 month stay and thereby delay generic competition. Indeed, but for Teva's unlawfully listed patents, it would not have had standing to file patent litigation before a competitive product launch in the first instance.

10.     What's more, Teva dismissed most of its  infringement claims against the second and third competitors over the course of the patent litigation, on a piecemeal basis, to drag the litigation out while ensuring that the validity and/or infringement of its patents could not be adjudicated, and that certain patents would remain a roadblock to competition, regardless of the outcome of the litigation. To be sure, Teva's litigation goal was not to protect its patents in good faith, but instead to buy a two-and-a-half-year (and more) delay in competition.

11.     *Sixth*, instead of suing the first would-be competitor, on information and belief, Teva entered into a reverse payment agreement-i.e., an agreement where the generic competitor refrains from launching its product-to bottleneck all competition. Under FDA law, the first generic applicant is eligible for six months of marketing exclusivity during which time all other generic applicants must wait before launching their products. By reaching an agreement with the first applicant not to launch, Teva could delay *all* competition, including the second and third applicants that it sued.

12.     Normally, agreements like the one between Teva and its first would-be competitor play out in the context of litigation. But Teva knew from its own past experience as a

generic company that if it reached an agreement *without* suing, it could bottleneck the competition for years.

13.     That is exactly what it did: although Teva's last valid drug-product patent expired in July 2015, there is *still-today*, eight years later-no generic version of QVAR available to purchasers continuing to pay supracompetitive prices for their QVAR requirements.

14.     Even eight years of improper monopoly is not enough for Teva. Teva recently announced the next phase of its anticompetitive scheme: it plans to — sometime in the near future — execute a second product hop, from the QVAR Redihaler to yet another inhaler device called the QVAR Digihaler. That product hop could extend Teva's unlawfully prolonged monopoly for up to *twenty more years*.

15.     Were it not for Teva's overarching anticompetitive scheme, affordable generic versions of QVAR would have become available years ago. Indeed, generic QVAR has been marketed and sold for years outside the United States, including in the UK, India, and Australia. Pharmacists would have substituted affordable generic QVAR for more expensive brand-name prescriptions. And the plaintiff and members of the class would not have been overcharged, collectively, hundreds of millions, if not billions, of dollars.

16.     This suit is brought under federal antitrust law to recover the overcharges sustained by direct purchasers for QVAR and QVAR Redihaler as a result of Teva's unlawful monopoly.

## II.     PARTIES

17.     Plaintiff Value Drug Company is a corporation organized under the laws of the State of Pennsylvania and is located at 195 Theater Drive, Duncansville, Pennsylvania 16635. Value Drug Company purchased QVAR from Teva during the damages period and would have purchased a less-expensive competing beclomethasone dipropionate product, had it been

available.

18.     Teva Pharmaceutical Industries Ltd. is incorporated under the laws of Israel, with its principal place of business in Tel Aviv, Israel.

19.     Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business in Parsipanny, New Jersey. Upon information and belief, Teva Pharmaceuticals USA, Inc. is a subsidiary of Teva Pharmaceutical Industries Ltd.

20.      Teva Branded Pharmaceutical Products R&D, Inc. is a company organized under the laws of the State of Delaware with its principal place of business in Montvale, New Jersey. Upon information and belief, Teva Branded Pharmaceuticals R&D, Inc. is a subsidiary of Teva Pharmaceuticals USA, Inc.

21.     Norton (Waterford) Ltd. ("Norton") is a private limited company organized under the laws of the Republic of Ireland and has its registered office in Waterford, Ireland. It is a subsidiary of Teva Pharmaceuticals Industries Ltd. Norton trades (i.e., does business) as Ivax Pharmaceuticals Ireland and Teva Pharmaceuticals Ireland.

22.     Teva Pharmaceuticals Industries Ltd., Teva Pharmaceuticals USA, Inc., Teva Branded Pharmaceutical Product R&D, Inc., and Norton (Waterford) Ltd. are collectively referred to herein as the defendants, or Teva.

23.     Amneal Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 400 Crossing Boulevard, Third Floor, Bridgewater, NJ, 08807-2863.

### III.     JURISDICTION AND VENUE

24.     This action arises under section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover threefold damages, costs of suit and reasonable attorneys' fees for the injuries sustained by Direct Purchasers and members of the Class (defined herein) of direct purchasers of QVAR and QVAR Redihaler from Teva resulting from violations by Teva, as hereinafter

alleged, of Section 2 of the Sherman Act, 15 U.S.C. § 2. The jurisdiction of this Court is based

upon 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

25.     The defendants transact business within this district, and they transact their affairs

and carry out interstate trade and commerce, in substantial part, in this district and/or have an

agent and/or can be found in this district. Venue and personal jurisdiction are therefore

appropriate within this district under section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C.

§§ 1391(b), (c) and (d) because during the class period, Teva transacted business in this district

as stated above.

26.      This Court also has personal jurisdiction over each Defendant, because each

Defendant transacted business, maintained substantial contacts, and/or committed overt acts in

furtherance of this illegal scheme. The scheme was directed at, and had the intended effect of,

causing injury to persons residing in, located in, and/or doing business throughout the U.S.,

including in this district.

## IV.    CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on behalf of itself and, under Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure, as a representative of a Class defined as follows:

> All persons or entities in the United States and its territories who
> purchased branded QVAR in any form directly from Teva at any
> time during the period July 7, 2015 through the present (the
> "Class"). Excluded from the Class are Teva, its officers, directors,
> management, employees, subsidiaries, and affiliates, and all
> federal governmental entities.

28.     Members of the Class are so numerous that joinder is impracticable. Further, the

Class is readily identifiable from information and records in the possession of Teva.

29.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff

and all members of the Class were damaged by the same wrongful conduct of Teva, *i.e.*, they

11

paid artificially inflated prices for QVAR products and were deprived of the benefits of fair and efficient competition from less-expensive generic versions of QVAR as a result of Teva's wrongful conduct.

30.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

31.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and have particular experience with class action antitrust litigation in the pharmaceutical industry.

32.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Teva has acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Teva's wrongful conduct.

33.     Questions of law and fact common to the Class include:

a.   whether Teva illegally manipulated the Hatch-Waxman Act and FDA requirements for listing patents in the Orange Book to delay approval of generic forms of QVAR;

b.   whether Teva's challenged conduct suppressed generic competition to QVAR;

c.   whether Teva's challenged conduct harmed competition in the market in which QVAR is sold;

d.   whether Teva had any procompetitive justifications for its unlawful conduct, and if so, whether such justifications could have been accomplished by a less restrictive means;

e.   whether Teva possessed market power over QVAR;

f.   whether Teva maintained monopoly power by suppressing generic competition;

g.   to the extent a relevant market must be defined, what that definition is;

    h.   whether the activities of Teva alleged herein have substantially affected interstate commerce;

    i.   whether, and to what extent, Teva's conduct caused antitrust injury to the business or property of plaintiff and the members of the Class of direct purchasers of ProAir HFA in the nature of overcharges.

34.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

35.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.    INDUSTRY BACKGROUND

36.    Branded drug companies can obtain valid patents over their prescription drug products. These patents provide limited protection from generic competition by other drug companies for a fixed period-often called an exclusivity period-set by Congress.[1] Being able to protect truly novel products with patents encourages innovation and the development of new medications.

37.    During this exclusivity period, brand-name drugmakers can demand very high

---

[1] In addition, to encourage drug companies to ensure their drugs are safe and effective for use in children, the FDA may grant an additional six month "exclusivity" for a drug for which a brand drugmaker has studied its safety and efficacy in children. Accordingly, if a patent claiming a drug product were set to expire on January 1, and the drug's sponsor studied the effect of the drug product on children, its lawful exclusivity period would extend to July 1.

prices for medications that cost relatively little to manufacture. Because patent protection prevents other companies from making a competing generic version of the medication, purchasers and the public must pay those very high prices.

38.    Once a brand drug company's period of exclusivity expires, though, the company can no longer lawfully block generic competition. Other drug companies seeking to market generic versions of the drug-identical versions of the drug that are just as safe and effective, yet far less expensive-can enter the market. Generic drugs have saved the public more than $2.6 trillion over the past decade.

39.    The federal drug laws balance these competing interests: rewarding and incentivizing genuine innovation by brand-name drugmakers while ensuring the earliest possible availability of more affordable generic drugs.

40.    They accomplish this, in part, by requiring brand-name drugmakers to submit to the FDA information about patents that claim (i) a drug's active ingredient, (ii) a drug product that includes the active ingredient, or (iii) a method of using the drug. The FDA publishes this information in a ministerial capacity, without scrutiny, in the Orange Book, so that generic companies seeking to come to market know which patents might stand in their way.

41.    A would-be generic competitor must notify the brand-name drugmaker if it seeks to market a generic version of the brand-name drug before the expiration of an Orange Book listed patent for the brand drug. If the brand-name drugmaker has an objectively reasonable and good-faith reason to believe that the competitor's product would infringe a valid, enforceable patent, it can sue. By suing, the brand-name drugmaker can delay approval of the competing product for up to two and a half years.

42.    But unscrupulous drug companies can (and do) game the system by submitting

false or misleading patent information to the FDA's Orange Book-for example, by representing that a patent claims the drug when it does not. This forces a would-be competitor to give the brand company advance notice of competition; enables the brand company to sue; triggers an automatic delay of up to two-and-a-half-years in generic competition; and provides the opportunity for the brand-name drugmaker to settle the suit in a way that delays competition even more.

A.    **The Federal Drug Laws Speed Generic Drug Availability By (i) Allowing Generic Drugmakers To File Abbreviated Drug Applications And (ii) Streamlining Patent Disputes**

43.    The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.* governs the manufacture, sale, and marketing of prescription drugs in the United States.

44.    Before any drug may be sold in the United States, it must first be approved by the FDA. There are three types of drug applications for FDA approval, two for brand-name drugs and one for generics.

45.    A manufacturer seeking to market and sell a new brand drug must submit a New Drug Application, or NDA. Typically, an NDA is submitted pursuant to §505(b)(1) of the FDCA and must include specific and extensive data concerning the safety and effectiveness of the drug.

46.    Sometimes, as with QVAR, an application may be submitted under § 505(b)(2) if the proposed product has the same active ingredient as an already-approved product (called the reference product), but in a different amount, dose, or form. A brand-name drugmaker that files a § 505(b)(2) NDA may rely on the reference product's data rather than incurring the expense and burden of conducting clinical trials.

1.    **In the Hatch-Waxman Amendments, Congress created a streamlined, abbreviated approval process for generic drugs.**

47.    Until 1984, all drugmakers had to submit voluminous NDAs with costly and

15

time-consuming clinical studies before they could market or sell any drug-brand name *or* generic. Because would-be generic companies intended to make their drugs available at an affordable price, clinical studies were almost always cost prohibitive. And even those companies able to shoulder that cost faced potentially ruinous liability: if their product infringed just one of the brand-name drugmaker's patents, the brand company could sue once they launched, exposing the company to significant litigation costs and the possibility of significant monetary damages.

48.    Because of these risks, generic companies just waited until they were certain they could no longer be sued before even beginning to try to develop a much needed generic drug. As a result, in 1983, 65% of brand-name drugs with no patent protection had no generic competition, and only 19% of non-antibiotics prescriptions were filled with generic drugs.

49.    In 1984, Congress tried to address this problem by enacting the Drug Price Competition and Patent Term Restoration Act, known as the Hatch-Waxman Amendments to the FDCA. The Hatch-Waxman Amendments created a simplified pathway to approval for generic drugs.

50.    Rather than requiring expensive, time-consuming clinical trials for generic drugs, the Hatch-Waxman Amendments allow a generic drug company to file an Abbreviated New Drug Application, or ANDA. In an ANDA, a generic company can establish that its product is bioequivalent to the brand-name drug (the reference-listed drug)-meaning that the generic drug contains the same active ingredient(s) in the same amount, administered in the same form, at the same strength; and is absorbed into the body in the same way, at the same rate, and to the same extent as the brand-name drug. A showing of bioequivalence demonstrates that the generic drug has the same clinical effect as its brand-name counterpart and allows the ANDA applicant to rely on the NDA's clinical studies to prove its own drug safe and effective.

51.     Drugs that are bioequivalent are also therapeutically equivalent, meaning that one may be substituted for the other. The FDA has a term for this: generic drugs that are bioequivalent to brand-name drugs are "AB-rated" to the brand-name drug.

52.     Every state has adopted laws that require or permit pharmacies to substitute lower-cost AB-rated generic equivalents for brand-name prescriptions.

53.     As a result, when an AB-rated generic drug enters the market, prices decline rapidly and sales shift quickly to the generic product. Often 80% of the market shifts to generic sales within six months after generic entry. Within a year, generic drugs typically capture 90% of sales, and the price drops to just 15% of the branded price.

54.     To ensure that this brand-to-generic switch happens as soon as possible, the Hatch-Waxman Amendments introduced a second innovation: a streamlined process for resolving disputes over Orange Book-listed patents.

**2.     The Hatch Waxman Amendments streamlined patent dispute resolution.**

55.     The drug laws provide a way for generic companies to challenge weak or invalid drug patents without risking damages if the patents are upheld.

**i.     The plain language of the Hatch-Waxman Amendments limits Orange Book listings to patents that claim the drug or a method of using the drug for which the applicant submitted the application.**

56.     From 1983 until 2020 the FDCA required NDA applicants to submit the following to the FDA:

> the patent number and the expiration date of any patent which *claims the drug for which the applicant submitted the application* or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.

57.     In this provision, Congress imposed a two-part listing test; brand-name

drugmakers may submit only those patents that satisfy both prongs for listing in the Orange Book.

58.     First, the universe of patents that Congress contemplated in this provision is narrow. Not only must the patent claim a drug (or a method of using that drug), it must also claim the drug or a method of using the drug for which the brand drug company submitted its NDA. And it is not enough for a patent to just mention a drug for which an NDA holder submitted its NDA: it must "claim" that drug.

59.     "Claim" has a specific meaning in the patent law context. A patent's "claim" is "the portion of the patent document that defines the scope of the patentee's rights." It is found in "specific, formal language recited at the conclusion of a patent 'specification,' which is the required written description of an invention . . . in a patent or patent application."

60.     A mere reference to the drug for which a brand-name drugmaker submitted its application that appears elsewhere in a patent, such as the abstract or specification, is not enough to list a patent in the Orange Book. The reference to the drug for which a brand-name drugmaker submitted its NDA must appear in the claims. A patent that does not mention, much less claim, a drug cannot lawfully be submitted to the FDA for listing in the Orange Book.

61.     Second, the patent must reasonably be capable of being asserted against a would-be competitor seeking to make the drug. The brand-name drugmaker must not submit a patent it knows, or should know, is invalid or unenforceable.

62.     If a patent fails to satisfy either one of the statutory listing test's two criteria, a brand-name drugmaker may not submit it for listing in the Orange Book.

63.     A brand-name drugmaker may obtain additional patents after NDA approval. If those patents satisfy the two-part statutory listing test, the brand-name drugmaker must submit

the patents' information to the FDA once they issue.

      **ii.    The FDA's implementing regulations limit drug patents to those that claim the drug substance or a drug product containing the drug substance.**

64.    In October 1994, the FDA issued a regulation, 21 C.F.R. § 314.53, implementing Congress' two-part statutory listing test. There are three key provisions in those initial implementing regulations.

65.    First, a brand drug company cannot submit a patent unless it claims a drug substance, drug product, or method of using a drug substance or drug product. The regulations explained which patents "claim[] the drug" within the meaning of the statute: "*drug substance* (active ingredient) patents, *drug product* (formulation and composition) patents, and method-of-use patents."

66.    The FDA reiterated what was clear from the plain language of the statute: only patents that claim the drug for which an NDA was filed may be submitted. The final rule declared that "[f]or patents that claim the drug substance, the applicant shall submit information *only* on those patents that claim the drug substance *that is the subject of the pending or approved application*, or that claim a drug substance that is the same as the active ingredient that is the subject of the approved or pending application."

67.    Second, the regulations obligate the drugmaker to identify the type of patent it is submitting.  Section 14.53(c)(1) sets forth the patent information that an NDA holder must submit to the FDA including: (i) the patent number and the date on which the patent will expire; (ii) the "type of patent, i.e., [d]rug substance (active ingredient), drug product (formulation or composition), and method-of-use'"; and (iii) the name of the patent owner or owners. During the rulemaking process, the FDA rejected commenters' suggestions that brand-name drugmakers should not be held to identifying patents as drug substance, drug product, or method-of-use

patents.

68.     Third, brand-name drugmakers must submit a declaration that the submitted patent is properly listable. To ensure that brand-name drugmakers truthfully submitted only those patents that were permitted by the statute's plain language and the explanatory text of § 314.53(b), the FDA's regulations required that any patent submission be accompanied by a signed declaration:

> The undersigned declares that Patent No. ____ covers the formulation, composition, and/or method of use of (*name of drug product*). This product is (*currently approved under section 505 of the Federal Food, Drug, and Cosmetic Act*) [or] (*the subject of this application for which approval is being sought*): _____

69.     This new regulation, § 314.53, went into effect on November 2, 1994.

### iii.     In 2003, the FDA amended its Orange-Book-listing regulations in response to improper listings.

70.     On June 18, 2003, the FDA amended § 314.53 of its regulations "to help ensure that NDA applicants submit only appropriate patents," and to prevent brand name drugmakers from "submitting patents that do not meet the statutory and regulatory requirements."

71.     The FDA did not change the key provisions of its rules: it reiterated that the statute imposed a two-part test requiring applicants to submit only a "patent that claims the drug or a method of using the drug that is the subject of the new drug application . . . *and* with respect to which a claim of patent infringement could reasonably be asserted" against a would-be competitor.

72.     There are four key clarifying provisions in the new rule and the FDA's accompanying commentary.

73.     First, the FDA removed any ambiguity as to what it meant for a patent to claim the "drug product." The new rule provided a very clear explanation of how an NDA holder could

determine whether a patent "claims the drug" within the meaning of the statute: Read the FDA's regulations.

74.     Under § 314.53, "[f]or patents that claim a drug product, the [NDA holder] shall submit information *only* on those patents that claim a drug product, *as is defined in § 314.3*, that is described in the pending or approved application."

75.     Section 314.3 provides the definitions that apply to Part 314 of the FDA's regulations, including the Orange Book listing regulations.

76.     It defines "drug substance" as "an active ingredient that is intended to furnish pharmacological activity or other direct effect."

77.     It defines "drug product" as "a finished dosage form, e.g., tablet, capsule, or solution, *that contains a drug substance*, generally, but not necessarily, in association with one or more other ingredients."

78.     The definition of drug product incorporates the defined term "drug substance." Putting the two definitions together, then, the FDA defines "drug product," for purposes of its listing regulations, as:

> a finished dosage form, e.g., tablet, capsule, or solution, that contains ["an active ingredient that is intended to furnish pharmacological activity or other direct effect"], generally, but not necessarily, in association with one or more other ingredients.

79.     In the Orange Book listing regulations, therefore, the FDA made it clear: only those patents that claim the drug substance, either on its own or in combination with other ingredients, may be submitted for listing in the Orange Book.

80.     A patent which claims some aspect of an approved drug *in combination with* the drug substance may be listed. But a patent that claims that aspect alone, and *not in combination* with the active ingredient, must *not* be listed.

21

81.    For example, a patent that claims only an *in*active ingredient does not meet the definition of a drug product patent and must not be submitted to the Orange Book. But a patent that claims the inactive ingredient in combination with the drug's active ingredient would qualify as a "drug product" patent.

82.    Likewise, a patent that claims only a controlled-release tablet coating must not be listed submitted for listing in the Orange Book. But a patent that claims the drug coating in combination with the drug's active ingredient would be a "drug product" patent which should be submitted for listing in the Orange Book.

83.    And a patent that claims only a device used to deliver the active ingredient (such as an autoinjector, an injector pen, or an inhaler) must not be submitted for listing in the Orange Book. Only if the patent claimed the device *in combination with the active ingredient* could the patent lawfully be submitted.

84.    Second, the FDA's existing rules made clear that patents claiming a molecule other than the active ingredient must not be submitted. In its 2003 rulemaking, the FDA addressed uncertainty as to whether patents should be submitted for listing if they claimed a polymorphic form of an active ingredient.

85.    Third, the FDA *rejected* suggestions that device patents should be listed in the Orange Book. The FDA confirmed in its rulemaking that "patents claiming packaging . . . must not be submitted for listing in the Orange Book," because "[s]uch packaging and containers are distinct from the drug product and thus fall outside of the requirements for patent submission."

86.    Nevertheless, some commenters argued that that "integral" devices such as "metered dose inhalers" "should be submitted and listed." The FDA said no, explaining:

> [W]e have clarified the rule to ensure that if the patent claims the drug product *as defined in § 314.3*, the patent must be submitted

22

for listing.

> Section 314.3 defines a "drug product" as "* * * a finished dosage form, for example tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients." The appendix in the Orange Book lists current dosage forms for approved drug products. The list includes metered aerosols, capsules, metered sprays, gels, and pre-filled drug delivery systems. *The key factor is whether the patent being submitted claims the finished dosage form of the approved drug product.*

87.     The FDA made clear: the relevant question is whether a patent claims "a finished dosage form . . . that contains a drug substance, not whether it claims some "integral" aspect of the drug product. It *rejected* the idea that it was enough for a patent to claim just a device, even if that device was "integral" to using the drug.

88.     Fourth, the FDA strengthened brand-name drug companies' obligations to submit only truthful, accurate information. The FDA updated the declaration brand-name companies are required to make when submitting a patent for listing. It did so by providing a standardized form for patent submissions, called the FDA Form 3542 (the "Patent Listing Form").

89.     The Patent Listing Form requires companies to identify a patent by the patent number, issue and expiration dates, and owner, then asks a series of questions to guide the NDA holder in determining whether the patent is listable.

90.     Question 2.1 asks whether the patent "claim[s] the drug substance that is the active ingredient in the drug product described in the approved NDA or supplement." If the NDA holder answers "no," the form warns, the "FDA will not list the patent in the Orange Book as claiming the drug substance[.]"

91.     Question 3.1 asks whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*"; if the NDA holder answers "no," the "FDA will not list the patent in

the Orange Book as claiming the drug product[.]"

92.     And Question 4.1 asks whether the patent "claim[s] one or more methods of using the approved drug product." If the answer is "no," then the "FDA will not list the patent in the Orange Book as claiming the method of use[.]"

93.     The FDA reiterated in its rulemaking that its "patent listing role remains ministerial."

94.     In reviewing the Patent Listing Form, the FDA does not ensure that a brand-name drugmaker's answers are truthful; it merely ensures that the company has provided answers that, *if accurate*, would entitle the company to list the patent in the Orange Book.

95.     Instead, the agency strengthened the language of the declaration that the brand-name drugmaker's representative must sign to ensure compliance:

> The undersigned declares that this is an accurate and complete submission of patent information for the NDA or supplement approved under Section 505 of the Federal Food, Drug and Cosmetic Act. This time-sensitive patent information is submitted pursuant to 21 C.F.R. 314.53. *I attest that I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct*.
>
> Warning: a willfully and knowingly false statement is a criminal offense under 18 U.S.C. 1001.

**iv.      In 2020, Congress cracked down on continued listing abuse.**

96.     In 2019, the Orange Book Transparency Act was introduced in the U.S. House of Representatives. A House Committee report cited, among the reasons for the bill, the fact that "some branded drug manufacturers . . . are submitting patents . . . for the purpose of blocking generic competition."

97.     On January 5, 2021, it became law. It amended the FDCA's listing provision to reiterate that *only* drug substance, drug product, and method-of-use patents should be submitted

to the Orange Book. It required submission of:

> (vii) the patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug, and that
>
> > (I) claims the drug for which the applicant submitted the application and is a drug substance (active ingredient) patent or a drug product (formulation or composition) patent; or
> >
> > (II) claims a method of using such drug for which approval is sought or has been granted in the application.

**v.      Brand-name drugmakers, including Teva, still tried to change the rules.**

98.      In 2020, the FDA solicited comments from the public regarding how to strengthen its Orange-Book listing regulations.

99.      On August 30, 2020, Teva weighed in.

100.      In its comment, it misrepresented the FDA's 2003 rulemaking process, claiming that the

> FDA itself has explained: " . . . The key factor is whether the patent being submitted [for listing] claims the finished dosage form of the approved drug product," since those aspects of the approved drug product "are 'integral' to the drug product [and] require prior FDA approval" in light of their potential impact on the safety and effectiveness of the approved NDA product.

101.      That is not what the FDA said — in fact, part of it is not even the FDA's words. Rather brand drugmaker *commenters* said that patents should be listed if they "are 'integral' to the drug product [and] require prior FDA approval" — and the FDA said "*no.*" The FDA clarified that *instead of* the "integral to" test posed by the commenters, "[t]he *key factor* is whether the patent being submitted [for listing] claims the finished dosage form of the approved drug product."

102.    To avoid any ambiguity, here is the full passage from the 2003 Rulemaking (with

Teva's selective, misleading, and carefully arranged quotations bolded):

> (Comment 3) Most comments agreed that patents claiming
> packaging should not be submitted for listing. However, *some
> comments stated* that patents claiming devices or containers that
> are ''integral'' to the drug product or require prior FDA approval
> should be submitted and listed. These comments distinguished
> between packaging and devices such as metered dose inhalers and
> transdermal patches, which are drug delivery systems used and
> approved in combination with a drug.
>
> (Response) We agree that patents claiming a package or container
> must not be submitted. Such packaging and containers are distinct
> from the drug product and thus fall outside of the requirements for
> patent submission. However, we have clarified the rule to ensure
> that if the patent claims the drug product as defined in § 314.3, the
> patent must be submitted for listing. Section 314.3 defines a ''drug
> product'' as ''* * * a finished dosage form, for example, tablet,
> capsule, or solution, that contains a drug substance, generally, but
> not necessarily, in association with one or more other ingredients.''
> The appendix in the Orange Book lists current dosage forms for
> approved drug products. The list includes metered aerosols,
> capsules, metered sprays, gels, and pre-filled drug delivery
> systems.

The key factor is whether the patent being submitted claims the finished dosage form of the

approved drug product.

103.    Teva argued for the adoption of this "integral to" test that the FDA refused to

adopt during the 2003 rulemaking-and refused to adopt in response to five other brand-name

drugmaker's petitions.  Teva implicitly admitted that regulations did *not* require listing device-

only patents in the Orange Book, arguing only what the rule "should" or "ought" to be:

- "Teva generally believes that all patents which claim an integrated device
  component of an approved NDA product . . . *should be* listed in the
  Orange Book."

- "[W]e believe that patents *should be* listed in the Orange Book so long as:
  (1) the patent-at-issue legitimately claims an integrated device component
  of an approved NDA product or a method of using such a constituent part;
  and (2) FDA directly reviewed that integrated device component in

connection with, and as a condition of approving, the listed NDA product."

- "The dispositive question *ought to be* whether FDA directly reviewed an integrated device component in connection with . . . the listed NDA product in its proposed dosage form."

- The "question we believe *should be* dispositive to the patent-listing questions at issue here" is "whether . . . the claimed-by-patent integrated device constituent of a combination product . . . was reviewed by FDA"

104.    And Teva argued that any change the FDA made to its Orange-Book listing rules "should apply only prospectively-that is, after the effective date of any new regulations" — meaning that if a patent were improperly listed under the now-existing rules, any future rule change would not excuse that improper listing.

### vi.    The statutory and regulatory rules for Orange Book listings provide a very simple rule.

105.    These straightforward statutory and regulatory limitations on what patents may be listed as drug product or drug substance patents can be distilled to a very simple two-part rule.

106.    First, a patent can only be listed if it "claims the drug for which the applicant submitted the application or . . . a method of using such drug." That means:

- If a patent does not mention, let alone claim, the drug's active ingredient (or a method of using that drug's ingredient), then it must not be submitted for listing.

- If a patent merely mentions the drug's active ingredient in the specification, but does not include the active ingredient as a limitation in a claim, then it must not be submitted.

- If a patent claims an active ingredient for a drug other than the one that is the subject of the brand-name drugmaker's NDA, then it must not be submitted.

107.    Second, if a patent passes the first step of this test, the patent must be one that "could reasonably be asserted" against a would-be competitor. A brand-name drugmaker must not submit a patent that it knows is invalid or unenforceable.

108. If a patent does not pass both criteria under the listing test, it must not be listed in the Orange Book.

109. Teva broke this simple rule more than a dozen times over.

**3. The Hatch-Waxman Amendments require would-be generic companies to address each Orange-Book-listed patent.**

110. The notice provided by brand-name drugmakers to would-be competitors by submitting patents to the Orange Book is not a one-way street. In exchange, the Hatch-Waxman Amendments require would-be competitors to notify the brand-name drugmaker of any patents it believes are invalid or not infringed.

111. For each patent listed in the Orange Book, a would-be generic competitor must include in its ANDA one of four certifications:

(I)     No patents have been listed in the Orange Book;

(II)    Any listed patents have expired;

(III)   The would-be competitor will wait for a patent's expiration before marketing its competing product; or

(IV)   A listed patent "is invalid or will not be infringed by the manufacture, use, or sale" of the competitor's product.

112. If an ANDA applicant makes a certification under one of the first two paragraphs, then no patent will delay generic competition. At the other extreme, a certification under the third paragraph (known as a paragraph III certification) means the generic applicant will have to wait until the relevant patent has expired.

113. The fourth option, known in the industry as a "paragraph IV certification," provides a middle ground-a means to speed generic entry even when one or more patents are listed in the Orange Book. A generic competitor must notify the brand-name drugmaker of any paragraph IV certifications in its ANDA and provide a "detailed statement of the factual and

legal basis of the opinion of the applicant that the patent is invalid or will not be infringed." This

serves "to give notice, if necessary, to the patent holder so that any legal disputes regarding the

scope of the patent and the possibility of infringement can be resolved as quickly as possible."

114.    For method-of-use patents, there is a fifth option: a would-be competitor can file

what is known as a "section viii carveout." Under Section 505(j)(2)(A)(viii) of the FDCA, a

would-be generic competitor can submit a statement averring that it will not market the drug for

one or more methods of use claimed by a listed patent:

> [I]f with respect to the listed drug referred to in [section
> 505(j)(2)(A)(i)] information was filed under subsection (b) or (c)
> for a method of use patent which does not claim a use for which
> the applicant is seeking approval under this subsection, [the ANDA
> must contain] a statement that the method of use patent does not
> claim such a use.

If an ANDA applicant files a section viii statement, the patent claiming the protected method of

use cannot bar approval of the ANDA.

### 4.    Hatch-Waxman patent certifications may lead to litigation.

115.    Often a generic company that provides a brand-name drugmaker with a paragraph

IV notification will offer confidential access to its ANDA filing, allowing the brand-name

drugmaker to review portions of the ANDA to assess infringement.

116.    Filing an ANDA may provoke litigation. To incentivize generic companies to

bear this litigation burden, Congress provided an incentive. The first generic drug maker to file a

substantially complete ANDA containing a paragraph IV certification is eligible for 180 days of

marketing exclusivity when it launches.

117.    This first generic drugmaker is referred to as the "first-filer," and the exclusivity

it is eligible for is called the first-filer's six-month or 180-day exclusivity. "Exclusivity,"

however, is a bit of a misnomer. The FDCA prohibits the FDA from approving other *ANDAs*

during that 180-day period, but a brand-name drugmaker may sell or license a generic product, called an "authorized generic," under its NDA.

118.    If a first-filer certifies that it will wait until all Orange-Book listed patents expire, it does not get the six-month exclusivity. That is, the exclusivity is intended to serve as an incentive to try to bring generic drugs to market *before* all Orange-Book listed patents expire.

119.    But a generic drug company cannot race to be the first-filer and then sit on its exclusivity, bottlenecking the market indefinitely. The FDCA provides ways in which a first-filer may forfeit exclusivity. For example, a first-filer forfeits its exclusivity if it fails to launch its product within 75 days after the later of either (i) ANDA approval or (ii) a court decision finding, or a settlement admitting, that the patents blocking the first-filer from market entry are invalid or not infringed.

120.    A 180-day exclusivity is incredibly valuable to a generic applicant: automatic substitution laws and the fact that no other ANDAs may be approved during that time allows the first-filer to reap substantial profits. As the Supreme Court has recognized, "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first-filer.

   **5.    If a brand-name drugmaker has a reasonable, good-faith basis to believe its patents are valid and would be infringed, it may sue.**

121.    Under the Hatch-Waxman Amendments, the filing of an ANDA constitutes "technical" patent infringement and provides the brand company standing to sue for patent infringement before a single generic is sold by the generic company.

122.    If a brand-name drugmaker with a reasonable and good-faith belief that an ANDA product infringes one or more valid patents sues within forty-five days of receiving a paragraph IV notification, the Hatch-Waxman Act imposes an automatic stay preventing the

FDA from granting final approval to the ANDA until (a) the passage of 30 months or (b) a court decision finding that the patent is invalid or not infringed by the ANDA product, whichever happens sooner.  If a generic company asserts that it is pursuing a section viii carveout, however, then it does not trigger this mechanism, and cannot delay ANDA approval or the generic competition that follows.

123.    If an ANDA is ready for approval before the stay is lifted or comes to its end, the FDA may grant "tentative approval." Tentative approval is warranted when an application satisfies all scientific and procedural conditions to final approval, but the FDA may not grant final approval due to the 30-month litigation stay.

**B.    Brand-Name Drugmakers Can Enforce Patents That Are Not Listed In The Orange Book.**

124.    Until Congress enacted the Hatch-Waxman Amendments, there was no streamlined patent resolution process: there was no centralized repository listing relevant patents, no paragraph IV certification process, and no ability for brand-name drugmakers to sue before a competitor launched the product. Instead, brand-name drugmakers had to wait to sue a would-be generic competitor until that competitor actually launched its generic product.

125.    This is how brand-name drugmakers defended their intellectual property for years. And it is how every owner of every other type of intellectual property-from blenders to computers, from automobiles to devices-protects their non-drug-substance inventions.

126.    The Hatch-Waxman Amendments created a special procedure specifically for patents claiming a drug substance, a drug product containing a drug substance, or a method of using a drug substance or product. It did not eliminate the right of a brand-name drugmaker to defend inventions *other* than a drug substance, drug product, or method-of-use through ordinary patent-law principles. A brand-name drugmaker seeking to defend a device patent, therefore,

may still sue after a competitor launches a product that it believes infringes that device patent.

**C.    Generic-Drug Availability Translates Into Substantial Savings.**

127.    When only a brand-name drug is available in the market, the cost of the medicine is very high. But that cost shrinks as generic drugs become available.

128.    The launch of even one generic version of a drug translates to substantial savings. As shown by economic research, the first manufacturer to launch a generic version of a drug prices its product just slightly below the price of the brand-name counterpart. State substitution laws requiring or permitting substitution of an AB-rated generic drug for a brand-name drug lead to a rapid shift in the market away from the brand-name drug and to the generic drug, even though there is only a slight discount on price.

129.    According to the FTC and FDA, the greatest price reduction occurs when a second generic competitor enters the market. Because the brand-name drugmaker rarely drops its price to match the first-filer's price, the first-filer does not face price competition if it is alone in the market. When a second competitor enters, whether it is the brand company with an Authorized Generic or another ANDA filer, the generic drugs compete on price. This drives prices down significantly: the launch of a second generic product results in a price reduction of approximately 50%.

130.    And once more generic drugs are allowed to enter the market, the price reduction can reach 85% or even more. Typically, in a fully "genericized" market, prices are close to marginal manufacturing costs.

**D.    Brand Companies Seeking To Unlawfully Prolong Their Monopoly Have Developed Ways To Abuse The Hatch-Waxman System And Leveraged Them To Delay Affordable Generic Drugs.**

131.    For as long as Congress has sought to speed the availability of affordable generic medications, brand-name drugmakers have frustrated those efforts.

1.      **Product hops.**

132.    One such tactic is called "product hopping," which undermines the

procompetitive, pro-generic, and pro-affordability aims of states' generic substitution laws.

133.    Here is how a product-hopping scheme works. A brand-name drugmaker knows

that, when a would-be generic competitor gains FDA approval for the brand-name drugmaker's

drug, it will quickly lose market share and profits to generic market entrants. To thwart that risk,

the brand-name drugmaker makes minor (usually immaterial) changes to a drug product, such as

a change to the marketed dosages or to the form of the drug (i.e., changing the drug from a

capsule to a tablet). Then it takes steps to destroy the market for the original formulation.

134.    There are two kinds of product hops: "soft switches" and "hard switches."

135.    In a soft-switch, a brand-name drugmaker leaves the original formulation on the

market, but drives physicians to prescribe the new formulation.

136.    In a hard-switch product hop, a brand-name drugmaker removes the original

formulation from the market entirely. This ensures that no physician can write a prescription for

the old brand-name drug formulation, and that no generic substitution can occur at the pharmacy

counter.

137.    Product hops work because a generic drug can only be substituted for a brand-

name drug prescription if the two products are AB-rated to one another. A generic company's

product, designed to be AB-rated to the original, pre-hop, product is not AB-rated to the tweaked

post-hop formulation. A would-be competitor could switch its formulation to meet the

characteristics of the hopped product-but not without redesigning its product and restarting the

FDA approval process.

2.      **Wrongful Orange Book listings.**

138.    Another tactic deployed by brand-name drug companies to exploit the Hatch-

Waxman framework and delay competition is wrongful Orange Book listings.

139.     In creating the streamlined patent resolution process outlined above, the FDA struck a careful balance. Brand-name drugmakers benefit from asserting their intellectual property before a competing generic drug is launched and having up to two-and-a-half years to resolve good-faith patent disputes. Generic companies benefit from having a resource to identify drug patents that may block their drug product and a means of addressing disputes without risking damages.

140.     But this trade-off comes with risks. As one commenter has noted: "Orange Book listing elevates every patent as a potential source of delay to generic competition," because listing a patent gives the brand-name drugmaker "almost automatic injunctive relief for even marginal infringement claims."

141.     Brand-name drugmakers have weaponized this process. Listing a patent in the Orange Book that does not satisfy the two-part statutory listing test forces would-be competitors to make a certification to the patent (even though the patent does not belong in the Orange Book and should require no such certification). If the generic company makes a paragraph IV certification, the brand-name drugmaker gets to sue and trigger an automatic two-and-a-half-year delay in competition.

142.     In other words, a brand-name drugmaker that improperly lists patents in the Orange Book can trigger an almost automatic two-and-a-half-year delay in competition. That is two-and-a-half years of additional monopoly profits gained by submitting to the Orange Book a patent that does not satisfy the two-part listing test.

143.     An improperly listed Orange Book patent also provides the possibility that the first filing generic company can be eligible for First to File exclusivity, which can be used to

delay approval of later ANDA filers, particularly if the brand company enters into a settlement with the First to File generic company.

### 3.      Reverse payment agreements

144.    Hatch-Waxman litigations create potential for delays in another way. A litigation, once filed, must be resolved. Most commonly, Hatch-Waxman litigation ends in a settlement — litigation all the way to final judgment is rare.

145.    In a lawful Hatch-Waxman litigation settlement, the brand-name drugmaker and generic drugmaker reach consensus about the strengths or weaknesses of their litigation positions and the likelihood that the patent or patents will be upheld as valid and infringed. The brand-name drug maker then gives the generic competitor a license to enter on a specific date that reflects the brand's chances of success. So, for example, if there are ten years left on a patent's term, and a brand-name drugmaker has a 40% chance of defending its patents, it would provide its challenger with a license to enter the market after four years. Usually no money exchanges hands, in either direction, in a lawful patent-term split settlement.[2] As the FTC has explained, "[i]n light of the uncertainties facing parties at the time of settlement, it is reasonable to assume that an agreed-on entry date, without cash payments, reflects a compromise of differing litigation expectations."

146.    But some drug companies seeking to forestall competition and preserve monopoly profits have designed a different settlement structure: a "reverse-payment" or "pay-for-delay" settlement. In a reverse payment settlement, a brand-name drugmaker plaintiff provides compensation, in cash or in some other form of value, to a would-be-competitor defendant "to respect its patent and quit its patent invalidity or noninfringement claim." A

---

[2] A brand-name drug company may, but need not and does not always, pay the generic competitor a small sum reflecting saved litigation expenses.

"payment" to a competitor "in return for staying out of the market" unlawfully prolongs a patentee's monopoly.

147.    For example, take the hypothetical example of a brand-name drugmaker with a drug worth $1 billion per year; it knows that, once a generic version of its drug becomes available, it will quickly lose 85% of those profits, or $850 million a year. Since a generic is sold at a much lower cost than the brand-name drug, a would-be generic competitor may expect to make $150 million a year selling the drug. In a typical, if simplified, pay-for-delay deal, the brand-name drugmaker might pay that generic competitor $200 million to settle the litigation and delay entering the market by one year: the brand preserves $600 million in monopoly profits that it would have otherwise lost to generic competition; and the generic company collects more than it could have had it launched and sold its product.

148.    As the FDA has explained, when a "patentee seeks to induce [a] generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market," "the patentee and the challenger gain; the consumer loses."

149.    The "payment" in a reverse payment may be a misnomer; brand-name drugmakers cannot simply hand over a bag of cash to a would-be competitor. Instead, drug companies executing a pay-for-delay agreement disguise the payment in opaque contractual terms. Common forms of reverse-payment deals include a "no-authorized-generic agreement"; a royalty payment that vanishes if another generic enters the market; or an "acceleration clause" in which a brand-name drugmaker promises to thwart later-filing generic applicants' efforts to bust the first-filer's exclusivity.

## VI.    FACTUAL BACKGROUND

150.    Eight percent of the U.S. population suffers from asthma.

151.    Asthma is a treatable, but potentially deadly, condition in which the airways in a

person's lungs constrict, causing coughing, wheezing, and shortness of breath. Sometimes, an acute asthma attack, if not quickly treated, can cause death. So, patients with asthma depend on having access to effective medications that they know will prevent or stop an asthma attack.

## A.    QVAR Was An Expensive Brand-Name Asthma Medication.

152.    QVAR was a brand-name asthma medication sold by Teva since at least the mid-2000s. It contained the drug substance beclomethasone dipropionate together with an HFA (or hydrofluoroalkane), and came in two strengths: 40 mcg and 80 mcg.

153.    Neither Teva nor Norton invented the first metered dose inhalers, the first dose counters for inhalers, or even the active ingredient in QVAR.

### 1.    3M, not Teva nor Norton, invented QVAR.

154.    Beclomethasone dipropionate is a very old drug: it was first approved by the FDA in 1972. The original beclomethasone dipropionate patent is long expired.

155.    Multiple types of beclomethasone dipropionate have been approved over the years, in addition to QVAR's beclomethasone dipropionate, such as beclomethasone dipropionate monohydrate.

156.    Beclomethasone dipropionate is a corticosteroid — a diester of beclomethasone.

157.    Beclomethasone dipropionate is not a polymorph of beclomethasone.

158.    Beclomethasone is not an active ingredient approved by the FDA.

159.    Beclomethasone dipropionate is not the same drug substance as beclomethasone dipropionate monohydrate.

160.    Beclomethasone dipropionate is not the same drug substance as beclomethasone.

161.    In 1995, the Minnesota Mining and Manufacturing Co. (more commonly known as 3M) filed an application for an aerosolized version of beclomethasone dipropionate containing a hydrofluoroalkane.

37

162.    On July 7, 1998, the U.S. Patent and Trademark Office ("PTO") issued U.S.

Patent No. 5,776,432 (the '432 patent), entitled "Beclomethasone solution aerosol formulations."

163.    The '432 patent had one independent claim:

> An aerosol formulation comprising a therapeutically effective
> amount of beclomethasone 17,21 dipropionate, a propellant
> comprising a hydrofluorocarbon selected from the group consisting
> of 1,1,1,2-tetrafluoroethane, 1,1,1,2,3,3,3- heptafluoropropane, and
> a mixture thereof, and ethanol in an amount effective to solubilize
> the beclomethasone 17,21 dipropionate in the propellant, the
> formulation being further characterized in that the beclomethasone
> 17,21 dipropionate is dissolved in the formulation, and that the
> formulation is free of any surfactant.

164.    The '432 patent had 11 dependent claims, each varying the details of the

invention in claim 1, such as the percent by weight of beclomethasone dipropionate, the amount

of ethanol, or which of the hydrofluorocarbons was selected.

165.    The '432 patent expired July 7, 2015.

**2.      3M, not Teva or Norton, incurred the expense or burden of obtaining FDA
         approval for QVAR.**

166.    3M, not Teva nor Norton, sought and obtained FDA approval to make, market,

and sell QVAR.

167.    The active ingredient of QVAR is beclomethasone dipropionate HFA.

168.    3M filed its QVAR NDA (NDA number 20-911) on May 11, 1998. It filed a §

505(b)(2) NDA, relying for approval on studies performed on a different asthma drug. Whereas

3M sought approval for a drug containing the drug substance beclomethasone dipropionate *HFA*,

it depended for approval on studies performed for a different drug containing a different drug

substance, beclomethasone dipropionate *CFC*.

169.    The FDA approved QVAR on September 15, 2000, with an indication for

maintenance treatment of asthma — i.e., not to treat an asthma attack, but to prevent an attack

from happening. It approved QVAR for use in, and for sale together with, a metered dose inhaler, sometimes referred to as an MDI.

170.    When QVAR was approved, it was the only inhaled asthma product on the market that did not contain chlorofluorocarbons, or CFC. And it delivered the active ingredient, beclomethasone dipropionate, in particles one third the size of the particles delivered in other asthma products, meaning it would disperse through a patient's airways differently than other inhaled asthma products.

171.    These characteristics differentiated QVAR from other asthma products.

**3.    After winning FDA approval, 3M submitted five patents for listing in the Orange Book — even though two of the patents did not claim QVAR.**

172.    Beclomethasone dipropionate first appeared in the 10th Cumulative Supplement of the 20th Edition of the Orange Book.

173.    As the FDA noted during its 2003 rulemaking, "The appendix in the Orange Book lists current dosage forms." Each listed product, then, identifies the dosage form of that product.

174.    When QVAR was first listed in the Orange Book, the product was characterized as a metered aerosol. At all relevant times, QVAR was listed in the Orange Book as a metered aerosol.

175.    In its NDA, 3M identified three patents that it said claimed QVAR. Upon approval, 3M submitted those three patents for listing in the Orange Book under the entry for QVAR, along with two more.

176.    First, 3M identified U.S. Patent No. 5,605,674 (the '674 patent), entitled "Medicinal aerosol formulations," in its QVAR application. The PTO issued the '674 patent on February 25, 1997.

177.    It contained one claim. "Beclomethasone dipropionate" does not appear within this claim.

178.    The '674 patent does not claim beclomethasone dipropionate.

179.    Because the '674 patent does not contain a claim that includes beclomethasone dipropionate as a claim element, it does not claim either the drug substance beclomethasone dipropionate or a drug product "that contains" beclomethasone dipropionate.

180.    The '674 patent expired on February 25, 2014.

181.    The second patent 3M identified in its QVAR NDA as claiming QVAR is U.S. Patent No. 5,695,743 (the '743 patent) entitled "Medicinal aerosol formulations."

182.    The PTO issued the '743 patent on December 9, 1997. It contained one independent claim and four dependent claims.

183.    The '743 patent expired July 6, 2010.

184.    The third patent identified by 3M was U.S. Patent No. 5,683,677 (the '677 patent), entitled "Medicinal aerosol formulations."

185.    The PTO issued the '677 patent on November 4, 1997. It contained one independent claim and 2 dependent claims.

186.    "Beclomethasone dipropionate" does not appear within any of these claims.

187.    The '677 patent does not claim beclomethasone dipropionate.

188.    Accordingly, the '677 patent does not claim either the drug substance beclomethasone dipropionate or a drug product "that contains" beclomethasone dipropionate.

189.    The '677 patent expired on November 4, 2014.

190.    Following FDA approval, 3M caused these three patents to be listed in the

Orange Book. Additionally, it submitted the '432 patent, and a fifth patent, U.S. Patent No.

5,766,573 (the '573 patent) in the Orange Book. Collectively, these five patents are referred to in

this complaint as the "original QVAR patents."

191.    The '573 patent, entitled "Medicinal Aerosol formulations," was issued by the

PTO on June 16, 1998. It contained one independent claim and two dependent claims.

192.    The '573 patent claims a method of *delivering* a drug, not a method of *using* a

drug to treat a medical condition.

193.    The '573 patent expired November 28, 2009.

194.    3M submitted the '432, '674, '743, and '677 patents as drug product patents

(even though two of them did not claim Beclomethasone dipropionate). It submitted the '573

patent as a method-of-use patent.

**4.      Through a product license and a corporate acquisition, Teva became the
owner of the QVAR NDA and original QVAR patents.**

195.    On April 2002, 3M announced that it had granted an exclusive U.S. license, and a

non-exclusive worldwide license, to market QVAR to a company called Ivax Corporation

("Ivax"). The license deal gave Ivax the rights to obtain ownership of the U.S. QVAR trademark,

as well as related patents and the NDA after five years.

196.    3M reported this change to the FDA in a "changes being effected" notification

dated January 31, 2003; and the FDA approved a change to the QVAR label to reflect that Ivax

would be QVAR's distributor, effective August 1, 2003.

197.    On July 25, 2005, Teva announced that it had acquired Ivax, including its

"significant respiratory business" that also included Ivax's QVAR license. Teva and Ivax

completed the acquisition in 2006, and Ivax became a subsidiary of Teva.

198.    On June 4, 2007, 3M assigned the '432 patent to Ivax LLC. It did not, however,

assign the '743, '677, '674, or '573 patents to Ivax.

199.    In or around April 2007, Ivax, now a subsidiary of Teva, obtained the trademark and NDA for QVAR from 3M, consistent with the licensing agreement struck in 2002. Teva claimed QVAR as its own product, and the FDA thereafter directed correspondence concerning QVAR to Teva.

**5.    Neither Teva nor Norton invented metered dose inhalers.**

200.    Neither Teva nor Norton invented the inhaler, or even the metered-dose inhaler — or even a metered dose inhaler with a dose counter.

201.    The invention of the inhaler dates back to the founding of this country. The first inhaler, called the "Mudge Inhaler" was invented in 1778.

202.    Nebulizers and dry-powder inhalers were invented in the 1800s.

203.    The metered dose inhaler was invented as early as 1956.

**6.    Neither Teva nor Norton invented the concept of a counter on a metered dose inhaler.**

204.    The idea to add a dose counter to an inhaler did not originate with Teva or Norton. Nor were those companies the first to add a dose counter to an inhaler.

205.    The idea of a dose counter was widely practiced for decades before Teva acquired QVAR. By the early 2000s, many manufacturers of inhaled asthma products contemplated adding dose counters to their rescue inhaler products. Some dose counters operated as a gear, turned one notch each time the aerosol container was pressed into the inhaler, dispensing a dose. Others used a scrolling tape, wound around a roll, and slowly unrolled, dose by dose, revealing the number of remaining doses. Yet others used an electronic dose counter.

206.    3M itself had filed a patent application for an inhaler that indicated the quantity of doses dispensed or remaining in an aerosol vial-using a rotatable indicator-in November 1991,

claiming priority to a British application filed a year earlier.

207.    But 3M did not include the dose counter on the inhaler that it proposed to use with QVAR when it filed its QVAR NDA.

208.    Dose counters can be an important feature of a rescue inhaler — that is, an inhaler taken when a patient is having an asthma attack. Since the frequency, timing, and number of doses a patient may take is dictated not by a typical dosing schedule (i.e., once a day, twice a day, three times a day), a patient must know when their medicine, which is contained within an opaque metal container, is running low. Otherwise, patients risk finding themselves without critical rescue medication in the middle of a life-threatening health emergency.

209.    The dose counter's importance and utility does not carry over to maintenance asthma products. If a patient takes a maintenance medication on a predictable schedule, the date on which the inhaler will be empty is knowable and predictable. For example, if an inhaler contains 200 doses of an asthma medication, and a patient uses it twice a day, the patient knows she needs a refill after 100 days.

210.    A dose counter is therefore not essential — or particularly useful — to maintenance asthma drug products.

211.    But this did not stop Teva from adding a dose-counter to the inhaler sold with QVAR, and leveraging that immaterial change to delay competition.

**B.     As The Original QVAR Patents Approached Expiry, Teva Engaged In An Overarching Anticompetitive Scheme.**

212.    With patent expiry fast approaching, Teva searched for ways to prolong its monopoly over QVAR. What started small, with just one wrongful submission to the Orange Book, quickly grew into a multifaceted, overarching anticompetitive scheme that stretched for years, and has blocked affordable generic versions of an essential asthma product from the

market for almost a decade.

      **1.**      **January - August 2014: Teva added an unnecessary dose counter invented by Norton to its QVAR product.**

      213.     In 2003, the FDA issued a guidance document, requiring all *new* metered dose inhaler products to have a dose counter or dose indicator. In issuing this guidance, the FDA specifically said that it was not "intended for manufacturers of already marketed MDI drug products."

      214.     Nevertheless, Teva drew inspiration from this Guidance. It partnered with Norton, which had obtained a patent claiming a dose counter for a metered dose inhaler: U.S. Patent No. 6,446,627 (the '627 patent). And Norton had several more patent applications covering dose counters, or aspects of dose counters, in its pipeline.

      215.     Teva first obtained ownership of the QVAR NDA and intellectual property in 2007. But it did not seek to add a dose counter to the QVAR metered dose inhaler in 2007. Or in 2008. Or 2009, 2010, 2011, 2012, or 2013.

      216.     Instead, it waited until 2014. In 2014, Teva knew that the lawful patent monopoly over QVAR — protected by the '432 patent — was set to expire in July 2015. It sought a way to delay competition and prolong its supracompetitive profits beyond the expiration of the '432 patent. But the only way to do that would be to list in the Orange Book another patent, with a later expiration date, that claimed the drug product QVAR.

      217.     On January 21, 2014 — just 18 months before QVAR's patent expiration was due to expire — Teva filed supplemental New Drug Application (or sNDA) 20-911/S-026 to change QVAR. Specifically, it sought approval to add a dose counter to its QVAR product.

      218.     On May 22, 2014, the FDA approved the sNDA.

      219.     Once Teva had converted its QVAR product to include an inhaler with a dose

counter on it, it sought to make sure that change could hinder competition. On October 21, 2014, it submitted to the FDA a citizen petition, asking the FDA to refuse to approve any generic QVAR product unless "the proposed generic product incorporates a dose counter that functions in the same manner and has the same labeled instructions for use as QVAR®'s dose counter, as demonstrated by appropriate studies."

220.    By the point Teva submitted this petition, it already knew what answer the FDA would give. That is because the FDA had issued several draft guidances, and responded to three other petitions by Teva on the same topic. In 2003, the FDA issued guidance stating it expected all new metered-dose inhaler products to contain a dose counter. In two other guidances addressing specific asthma medications, the FDA had already explained that any generic version of a brand-name drug with a dose counter should also have a dose counter. And when Teva submitted petitions, the FDA responded consistent with those guidances.

221.    On May 20, 2015, the FDA responded to Teva's request. It once again told Teva that, for any brand-name medication in a metered-dose inhaler with a dose counter, the FDA intended to require a generic to also have a dose counter.

222.    So, although brand-name drug companies acting in good faith do not request the FDA to take an action the agency is already taking, or to adopt a policy that it has already adopted, that is just what Teva did. Teva's 2014 petition is nothing more than an attempt to confirm that it would succeed in its intent to thwart competition through the addition of an unnecessary dose counter to its QVAR product.

   **2.    August 2014 - November 2016: Teva wrongfully lists device-only patents in the Orange Book as claiming the drug product QVAR.**

223.    On July 7, 2015, when the '432 patent (the latest expiring of the original QVAR patents) expired, Teva's lawful monopoly over QVAR should have ended. But Teva submitted

two more patents for listing in the Orange Book. Neither patent claimed the drug product QVAR. These wrongful listings unlawfully prolonged its monopoly until December 18, 2018.

> **i.   Teva wrongfully caused the '627 patent to be listed in the Orange Book as a QVAR drug product patent.**

224.   In August 2014, Teva submitted a Patent Listing Form, identifying the '627 patent for listing in the Orange Book. On that form, Teva represented in response to Question 3.1 that the '627 patent was a drug product patent, and an employee or agent of Teva certified, on its behalf that "I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation," and "verif[ied] under penalty of perjury that the foregoing is true and correct."

225.   The '627 patent issued September 10, 2002.

226.   The '627 patent had 33 claims in it: 7 independent claims and 26 dependent claims.

227.   None of the claims in the '627 patent claims a dose counter in combination with beclomethasone dipropionate. Nor do the words beclomethasone dipropionate appear in the patent's specification.  The '627 patent does not mention, let alone claim, beclomethasone dipropionate.

228.   The '627 patent was listed in the Orange Book as a drug product patent. That means that Teva identified it as such in the '627 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3.*"

229.   Because the '627 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

230.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '627 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

231.    Because Teva wrongfully submitted the '627 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR beginning in August 2014.

232.    The '627 patent expired December 18, 2017.

> **ii.    Teva wrongfully caused the '289 patent to be listed in the Orange Book as a QVAR drug product patent.**

233.    In November 2016, Teva submitted a Patent Listing Form for another patent: U.S. Patent No. 9,463,289 (the '289 patent), entitled "Dose counters for inhalers, inhalers and methods of assembly thereof."

234.    The PTO issued the '289 patent on October 11, 2016. It contains one independent claim and 9 dependent claims.

235.    None of the claims of the '289 patent claims a dose counter in combination with beclomethasone dipropionate. In fact, the words "beclomethasone dipropionate" appear nowhere in the '289 patent. The '289 patent does not mention, let alone claim, beclomethasone dipropionate.

236.    The '289 patent was listed in the Orange Book as a drug product patent. That means that Teva identified it as such in the '289 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

237.    Because the '289 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question

3.1 was false.

238.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '289 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, was also false.

239.    Because Teva wrongfully submitted the '289 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

240.    The '289 patent, if valid, does not expire until May 18, 2031.

**3.    October 2016 - February 2018: Teva executed a hard-switch product hop to prevent competition.**

241.    On October 3, 2016, Norton submitted, through Teva, NDA 20-7921, a § 505(b)(2) application, seeking approval to make, market, and sell a "new" product.

242.    That product, Norton proposed, would be called the QVAR Redihaler, which is just QVAR's active ingredient in a new, proprietary inhaler device. Whereas a typical inhaler dispenses medication when the medication cannister is depressed into the inhaler device, the Redihaler is "breath actuated," meaning it dispenses medication when the user breathes in.

243.    The FDA characterized Norton's proposed QVAR Redihaler as "a breath actuated version of the applicant's QVAR Inhalation Aerosol." It characterized the drug substance of QVAR as beclomethasone dipropionate — the same as QVAR. And it characterized the drug product as a "solution formulation."

244.    On August 3, 2017, the FDA approved Norton's QVAR Redihaler application, clearing the way for Teva to launch QVAR Redihaler.

245.    Teva's press release touting the approval announced the product hop:

> QVAR® MDI with dose counter, the currently available form of
> QVAR®, was originally approved by the FDA in 2014. Teva plans

48

to discontinue sales of this current QVAR® MDI formulation upon
the launch of QVAR® Redihaler™ in the first quarter of 2018.

246.    On February 16, 2018, Teva launched QVAR Redihaler. When it announced the

launch, Teva also announced it was "discontinuing sales of the previously available QVAR®."

Teva did not discontinue QVAR for any safety reason.

247.    Teva priced QVAR Redihaler "at parity to QVAR®."

**4.      August 2017 - present: Teva improperly listed numerous patents in the
Orange Book to block competition to QVAR Redihaler.**

248.    The '432 patent expired three years before Teva obtained approval for QVAR

Redihaler, so Teva was not able to submit that patent for listing in the Orange Book under the

entry for QVAR Redihaler.

249.    Instead, Teva listed thirteen other patents in the Orange Book as claiming QVAR

Redihaler — four when the FDA approved QVAR Redihaler, and another 8 over the next five

years. A table of Teva's QVAR Redihaler submissions is attached as Appendix A.

250.    All of the patents claimed an inhaler device, or just a portion of an inhaler device.

Only two patents — which did not issue and were not listed until years after QVAR Redihaler's

approval — include beclomethasone dipropionate as a product claim element and arguably could

be listed as a drug product patent for QVAR Redihaler.

251.    None of the other patents that Teva caused to be listed in the Orange Book

claimed the drug product QVAR Redihaler.

252.    But that did not stop Teva from loading up their QVAR Redihaler Orange Book

entry with patents that should not have been listed.

253.    Upon approval in August 2017, Teva submitted four patents to the Orange Book.

**i.      Teva wrongfully caused the '627 patent to be listed in the Orange
Book as a QVAR Redihaler drug product patent.**

254.    First, Teva submitted the '627 patent — the same patent it had submitted in 2014 as claiming QVAR — as a drug product patent. As noted above, the '627 patent did not mention, let alone claim, beclomethasone dipropionate. As a result, and for the reasons described above, the information provided in Teva's Patent Listing Form was false, yet a representative of the companies falsely certified, under penalties of perjury, that the information was accurate.

### ii.    Teva wrongfully caused the '260 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.

255.    Second, Teva submitted a Patent Listing Form for U.S. Patent No. 7,637,260 (the '260 patent), entitled "Medicament dispensing device with a multimaterial diaphragm bounding a pneumatic force chamber."

256.    The '260 patent issued on December 29, 2009, and contains 12 claims: 2 independent claims and 10 dependent claims.

257.    None of those claims combine the inhaler device with beclomethasone dipropionate. In fact, the words "beclomethasone dipropionate" do not appear anywhere in the '260 patent. The '260 patent does not claim, let alone mention beclomethasone dipropionate.

258.    Teva submitted the '260 patent as a drug product patent. That means that Teva identified it as such in the '260 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

259.    Because the '260 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

260.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '260 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

261.     Because Teva wrongfully submitted the '260 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

262.     The '260 patent, if valid, expired November 2, 2022.

### iii.     Teva wrongfully caused the '712 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.

263.     Third, Teva submitted U.S. Patent No. 8,132,712 (the '712 patent), entitled "Metered-dose inhaler."

264.     The '712 patent issued on March 13, 2012, and contains 19 claims: 3 independent claims and 16 dependent claims. None of the '712 patent's claims combine an inhaler with beclomethasone dipropionate.

265.     The phrase "beclomethasone dipropionate" appears only in the patent's specification. Accordingly, the '712 patent does not claim either the drug substance beclomethasone dipropionate or a drug product "that contains" beclomethasone dipropionate.

266.     Teva submitted the '712 patent as a drug product patent. That means that Teva identified it as such in the '712 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

267.     Because the '712 patent does not claim beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

268.     Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '712 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

269.     Because Teva wrongfully submitted the '712 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the

Orange Book under the entry for QVAR Redihaler.

270.    The '712 patent, if valid, does not expire until September 7, 2028.

       **iv.    Teva wrongfully caused the '476 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.**

271.    Fourth, Teva submitted U.S. Patent No. 8,931,476 (the '476 patent), entitled "Inhaler."

272.    The '476 patent issued on January 13, 2015, and contains 18 claims — 2 independent claims and 16 dependent claims.

273.    Independent claim 1 of the '476 patent reads:

>    An inhaler for delivering medicament to a patient, the inhaler comprising a housing for holding the medicament and having an air inlet means and a medicament delivery port which together define an air flow path into which the medicament is dispensed,

>    wherein the air inlet means comprises an array of elongate apertures formed in the housing, wherein long sides of adjacent apertures face each other, and each aperture being provided with a respective different opening in an outer surface of the housing,

>    and wherein the opening of each aperture extends in two different planes such that, if at least a part of the opening is covered in one of two different planes during inhalation by the patient, a void space is created between a cover and the aperture so as to provide an air flow path through the void space to the at least one aperture, wherein a raised formation is provided in the outer surface of the housing between adjacent apertures to either limit or prevent a covered opening.

274.    Dependent claim 15 reads:

>    An inhaler according to claim 1, wherein the medicament is selected from the group consisting of salbutamol, formoterol, salmeterol, fluticasone, budesonide, *beclomethasone*, tiotropium, ipratropium and combinations thereof.

275.    Dependent claim 15 does *not* claim beclomethasone dipropionate. It claims only beclomethasone — which lacks the diester group that characterizes beclomethasone

dipropionate.

276.    None of the claims of the '476 patent recite beclomethasone dipropionate.

277.    The '476 patent does not claim either the drug substance beclomethasone dipropionate or a drug product "that contains" beclomethasone dipropionate.

278.    Teva submitted the '476 patent as a drug product patent. That means that Teva identified it as such in the '476 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

279.    Because the '476 patent does not claim beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

280.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '476 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

281.    Because Teva wrongfully submitted the '476 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

282.    The '476 patent, if valid, does not expire until July 17, 2031.

        **v.    Teva wrongfully caused the '509 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.**

283.    Even after Teva listed these four device-only, non-drug-product patents to the Orange Book, it continued to list patents that did not claim the QVAR drug substance or drug product in the Orange Book.

284.    In July 2018, Teva submitted a Patent Listing Form to the FDA for U.S. Patent No. 10,022,509 (the '509 patent), entitled "Dose counter for inhaler having a bore and shaft arrangement."

53

285.    The '509 patent issued on July 17, 2018, and contains 16 claims: 1 independent claim and 15 dependent claims.

286.    None of the '509 patent's claims recite beclomethasone dipropionate. In fact, the words "beclomethasone dipropionate" do not appear anywhere in the patent. The '509 patent does not mention, let alone claim, beclomethasone dipropionate.

287.    Teva submitted the '509 patent as a drug product patent. That means that Teva identified it as such in the '509 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

288.    Because the '509 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

289.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '509 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

290.    Because Teva wrongfully submitted the '509 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

291.    The '509 patent, if valid, does not expire until May 18, 2031.

> **vi.    Teva wrongfully caused the '510 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.**

292.    In July 2018, Teva also submitted a Patent Listing Form for U.S. Patent No. 10,022,510 (the '510 patent), entitled "Dose counters for inhalers, inhalers and methods of assembly thereof."

293.    The '510 patent was issued on July 17, 2018, and has 23 claims: 3 independent

claims and 20 dependent claims.

294.    None of the '510 patent's claims recite beclomethasone dipropionate. In fact, the words "beclomethasone dipropionate" do not appear anywhere in the patent. The '510 patent does not mention, let alone claim, beclomethasone dipropionate.

295.    Teva submitted the '510 patent as a drug product patent. That means that Teva identified it as such in the '510 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

296.    Because the '510 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

297.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '510 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

298.    Because Teva wrongfully submitted the '510 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

299.    The '510 patent, if valid, does not expire until May 18, 2031.

**vii.    Teva wrongfully caused the '156 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.**

300.    In October 2018, Teva submitted a Patent Listing Form for U.S. Patent No. 10,086,156 (the '156 patent), entitled "Dose counter for inhaler and method for counting doses."

301.    The '156 patent was issued on October 2, 2018, and contains 13 claims: 1 independent claim and 12 dependent claims.

302.    None of the '156 patent's claims recite beclomethasone dipropionate. In fact, the

words "beclomethasone dipropionate" do not appear anywhere in the patent. The '156 patent does not mention, let alone claim, beclomethasone dipropionate.

303.    Teva submitted the '156 patent as a drug product patent. That means that Teva identified it as such in the '156 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

304.    Because the '156 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

305.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '156 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

306.    Because Teva wrongfully submitted the '156 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

307.    The '156 patent, if valid, does not expire until May 18, 2031.

**viii.    Teva wrongfully caused the '512 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.**

308.    In July 2020, Teva submitted a Patent Listing Form for U.S. Patent No. 10,695,512 (the '512 patent), entitled "Dose counter for inhaler having an antireverse rotation actuator."

309.    The '512 patent issued on June 30, 2020, and has 6 claims: 1 independent claim and 5 dependent claims.

310.    None of the '512 patent's claims recite beclomethasone dipropionate. In fact, the words "beclomethasone dipropionate" do not appear anywhere in the patent. The '512 patent

does not mention, let alone claim, beclomethasone dipropionate.

311.   Teva submitted the '512 patent as a drug product patent. That means that Teva identified it as such in the '512 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

312.   Because the '512 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

313.   Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '512 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

314.   Because Teva wrongfully submitted the '512 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

315.   The '512 patent, if valid, does not expire until Mar. 15, 2032.

   ix.   **Teva wrongfully caused the '808 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.**

316.   In March 2020, Teva submitted a Patent Listing Form for U.S. Patent No. 10,561,808, entitled "Dose counter for inhaler having an anti-reverse rotation actuator."

317.   The '808 patent issued on February 18, 2020, and contains 29 claims: 1 independent claim and 28 dependent claims.

318.   None of the '808 patent's claims recite beclomethasone dipropionate. In fact, the words "beclomethasone dipropionate" do not appear anywhere in the patent. The '808 patent does not mention, let alone claim, beclomethasone dipropionate.

319.   Teva submitted the '808 patent as a drug product patent. That means that Teva

57

identified it as such in the '808 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

320.     Because the '808 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

321.     Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '808 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

322.     Because Teva wrongfully submitted the '808 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

323.     The '808 patent, if valid, does not expire until December 22, 2031.

> **x.     After years of obtaining patents and improperly listing them in the Orange Book Teva may have finally gotten one right.**

324.     In October 2020, Teva submitted a Patent Listing Form for U.S. Patent No. 10,792,447 (the '447 patent), entitled "Breath actuated inhaler."

325.     The '447 patent issued on October 6, 2020, and contains 10 claims: 2 independent and 8 dependent claims.

326.     Independent claim 1 of the patent reads:

A breath actuated metered dose inhaler comprising:

> a canister fire system configured to provide a canister actuation force to fire a medicament containing canister in response to patient inhalation, the canister fire system comprising a pneumatic force holding unit and having:

> a rest configuration in which a metering valve of the canister is in a refill configuration;

a prepared configuration in which a canister actuation force is retained by a difference in pressure between an enclosed volume within the pneumatic force holding unit and atmospheric pressure, and in which prepared configuration the canister fire system is actuable by patient inhalation induced airflow;

and a fire configuration in which the metering valve is in a dose delivery position;

wherein, in the prepared configuration, the force retained by the pneumatic force holding unit reduces but by less than about 6% over a period of 5 minutes.

327.   Dependent claims 4 through 6 read:

4. The breath actuated metered dose inhaler according to claim 1 comprising a medicament for use in the treatment of a respiratory disease.

5. The breath actuated inhaler according to claim 4 wherein the respiratory disease is selected from COPD and asthma.

6. The breath actuated inhaler according to claim 5 wherein the medicament is selected from the group consisting of an anticholinergic and a corticosteroid.

328.   And dependent claim 8 reads:

8. The breath actuated inhaler according to claim 6, wherein the corticosteroid comprises beclomethasone dipropionate.

329.   Thus, claim 8 claims a breath actuated inhaler (claim 1) containing a medicament for use in the treatment of a respiratory disease (claim 4); where the respiratory disease is either COPD or asthma (claim 5) and the medicament contains beclomethasone dipropionate (claims 6 and 8).

330.   No other claim of the '447 patent recites beclomethasone dipropionate. Therefore, based on claim 8 of the '447 patent, the '447 patent, in theory, could have been listed for the QVAR Redihaler drug product if the other mechanical claim limitations incorporated in claim 8 were also present in the approved QVAR Redihaler. However, the priority filing date for the

'447 patent is subsequent to the NDA approval date of the QVAR Redihaler.  This strongly suggests that the '447 patent is facially invalid as the QVAR Redihaler product that was approved by the FDA predates the priority date of the '447 patent and, thus, should be invalidating prior art.

331.    The '447 patent, if valid, does not expire until January 25, 2039.

332.    Teva did not list the '447 patent for more than three years after QVAR Redihaler's approval. It therefore could not have blocked approval for any would — be competitor who filed an ANDA between 2017 and mid-2020. Had Teva *not* improperly listed all of the other patents described herein, there would have been *no* patents listed in the Orange Book as claiming QVAR Redihaler for three years, and a would-be competitor would have been incentivized to submit an application for a competing product. But because Teva loaded up the Orange Book with improper listings of patents that did not claim the drug product QVAR Redihaler, it was able to create a daunting wall of patents to which a would-be competitors would be forced to make paragraph IV certifications. That wall of patents served as a deterrent to competition.

> xi.    **Teva wrongfully caused the '889 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.**

333.    In August 2022, Teva submitted a Patent Listing Form for U.S. Patent No. 11,395,889 (the '889 patent), entitled "Dose counter for inhaler having an antireverse rotation actuator."

334.    The '889 patent issued on July 26, 2022, and contains 6 claims: 1 independent claim and 5 dependent claims.

335.    None of the '889 patent's claims recite beclomethasone dipropionate. In fact, the words "beclomethasone dipropionate" do not appear anywhere in the patent. The '889 patent

does not mention, let alone claim, beclomethasone dipropionate.

336.    Teva submitted the '889 patent as a drug product patent. That means that Teva identified it as such in the '889 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

337.    Because the '889 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

338.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '889 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

339.    Because Teva wrongfully submitted the '889 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

340.    The '889 patent, if valid, does not expire until May 18, 2031.

> **xii.     Teva caused the '888 patent to be listed in the Orange Book as claiming QVAR Redihaler.**

341.    In August 2022, Teva submitted a Patent Listing form for U.S. Patent No. 11,395,888 (the '888), entitled "Inhalers and Related Methods."

342.    The '888 patent issued on July 26, 2022, and contains 30 claims: 2 independent claims and 28 dependent claims.

343.    Claim 1 describes a breath-actuated inhaler. Independent claim 10 describes that breath-actuated inhaler containing beclomethasone dipropionate.

344.    Assuming that the Redihaler device includes all of the other claim elements of claim 1 of the '888 patent this claim could in theory be listed for the drug product QVAR

Redihaler.

345.    The '888 patent issued from U.S. Patent Application No. 16/134,401, which was a continuation of U.S. Patent Application No. 15/881,283, which was originally filed in January 2018. The original '283 application did not include any proposed claim that described the Redihaler device in combination with beclomethasone dipropionate. Teva specifically filed the '401 continuation application to add claims which claimed the QVAR Redihaler drug product.

346.    This and claim 8 of the '447 patent demonstrate that Teva knew how to — and knew it should — obtain a patent that claimed the drug product QVAR Redihaler in combination with the inhaler device to properly list a patent for a QVAR drug product in the Orange Book. Yet it did not even attempt to obtain such patents until *after* QVAR Redihaler was approved, and in the meantime improperly listed patents for the QVAR Redihaler.

347.    But that, alone, was not enough to allow Teva to block all competition to its QVAR franchise. A would-be competitor may be able to design around one or two patents; and that would-be competitor would have greater incentives to do so when only one or two patents stood in its way, as opposed to a dozen patents.

> **xiii.    Teva resumed listing improper patents, wrongfully causing the '637 and '643 patent to be listed in the Orange Book as a QVAR Redihaler drug product patent.**

348.    In February 2023, Teva submitted a Patent Listing Form for U.S. Patent No. 11,559,637 (the '637 patent), entitled "Inhalers and related methods."

349.    The '637 patent issued on January 24, 2023, and contains 50 claims: 2 independent and 48 dependent claims.

350.    Claim 1 of the '637 patent reads:

> A breath actuated inhaler comprising:
>
> > a main body for accommodating a medicament reservoir;

a cannister firing system including

a trigger; and

a biasing element for moving a cannister to release a dose in response to air flow,

a cap housing,

an interior chamber defined by the main body and the cap housing, the cannister fire system and canister being enclosed within the interior chamber, and

a lock system including helical threads having non-overlapping and distinct thread segments for providing rotational attachment of the cap housing to the main body and a first lock member that cooperated with a second lock member to achieve a snap lock between the cap housing and the main body when the cap housing is rotationally attached to the main body in a locked position,

wherein the thread segments are radially disposed about a central axis and arranged such that the thread segments are non-overlapping with respect to each other along the central axis, and

wherein the first lock member is interposed between the thread segments.

351.    Dependent claim 11 reads: "A method of treating a respiratory disease or disorder comprising actuating the inhaler of claim 1 to administer a therapeutically effective amount of one or more active ingredients."

352.    And claim 16 reads: "The method of claim 11, wherein the one or more active ingredients comprise beclomethasone dipropionate or tiotropium bromide."

353.    Independent claim 28 reads:

A breath actuated inhaler comprising: a main body for accommodating a medicament reservoir, a canister fire system for moving a canister to release a dose in response to air flow, a cap housing for enclosing the canister fire system and canister within an interior chamber defined by the main body and the cap housing, and in which the main body and the cap housing are formed of plastics material characterized in that a lock system is provided for

63

locking the cap housing on the main body,

wherein the lock system includes:

helical threads having non-overlapping and distinct thread segments for providing rotational attachment of the cap housing on the main body; and

a first lock member that cooperates with a second lock member to achieve a snap lock between the cap housing and the main body when the cap housing is rotationally attached to the main body in a locked position,

wherein the thread segments are radially disposed about a central axis and arranged such that the thread segments are non-overlapping with respect to each other along the central axis, wherein the first lock member is interposed between the thread segments, and

wherein a release torque required to overcome the lock system is more than 1 Nm and lower than 4 Nm.

354.    Dependent claim 34 reads: "A method of treating a respiratory disease or disorder comprising actuating the inhaler of claim 28 to administer a therapeutically effective amount of one or more active ingredients."

355.    And dependent claim 39 reads: "The method of claim 34, wherein the one or more active ingredients comprise beclomethasone dipropionate or tiotropium bromide."

356.    Neither independent claim 1 nor independent claim 28 of the '637 patent claims the drug product QVAR Redihaler. Neither claims an inhaler device in combination with beclomethasone dipropionate.

357.    Dependent claims 16 and 39 mention beclomethasone dipropionate, but both claim a method of using an inhaler containing QVAR Redihaler's drug substance; they do not claim the drug substance or a drug product containing a drug substance.

358.    Yet in February 2023, Teva submitted the '637 patent for listing in the Orange Book as a drug product patent. That means that Teva identified it as such in the '637 patent

Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

359.    Because the '637 patent does not claim an inhaler in combination with beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

360.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '637 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

361.    Because Teva wrongfully submitted the '637 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

362.    The '637 patent, if valid, does not expire until July 21, 2039.

363.    In March 2023, Teva submitted a Patent Listing Form for U.S. Patent No. 11,583,643 (the '643 patent), entitled "Inhalers and related methods."

364.    The '643 patent issued on February 21, 2023, and contains 40 claims: 1 independent claim and 39 dependent claims.

365.    Claim 1 of the '643 patent reads:

> A method of metering inhalable substances, the method comprising:
>
> > providing a medicament inhaler having a metering valve with a metering chamber and a valve stem extending from the metering chamber to an interior reservoir of a canister, the valve stem defining a communication path between the metering chamber and the interior reservoir, the communication path including an opening configured to permit flow between a transfer space inside the valve stem and the interior reservoir;
> >
> > operating the medicament inhaler to cause substances

within the metering chamber to vaporise and the valve stem to be in a retracted position relative to the canister for a time period of about 2 minutes to about 24 hours such that atmospheric air enters the metering chamber;

following the time period, orienting the interior reservoir above the metering chamber to permit the atmospheric air within the metering chamber to be replaced with a liquid replacement from the interior reservoir; and

administering, from the liquid replacement, 75% to 125% of labelled claim for a dose.

366.    Dependent claim 16 claims "[a] method of treating a respiratory disease or disorder to administer a therapeutically effective amount of one or more active ingredients, the method including carrying out the method of claim 1."

367.    And dependent claim 21 claims "The method of claim 16, wherein the one or more active ingredients comprise beclomethasone dipropionate or tiotropium bromide."

368.    Norton filed the PTO application leading to the '643 patent in January 2018. In the original application, Norton purported to claim (1) the method of using an inhaler that ultimately appeared in the '643 patent, (2) an inhaler device, and (3) a method of using a metering valve.

369.    Norton's proposed inhaler claims appeared in proposed claims numbered 18-50. Proposed claim 18 purported to claim

An inhaler for the inhalation of inhalable substances, the inhaler comprising: a canister having an interior reservoir containing pressurized inhalable substances including fluid; a metering valve including a metering chamber and a valve stem defining a communication path between the metering chamber and a valve stem defining a communication path between the metering chamber and the interior reservoir, the communication path including an opening configured to permit flow between a transfer space inside the valve stem and the interior reservoir, the interior reservoir being arranged for orientation above the metering chamber whereby gas such as air located within the metering chamber is replaced with liquid from the interior reservoir.

And in proposed claim 37, Norton purported to claim "[t]he inhaler of Claim 18 which includes at least one inhalable substance in the interior reservoir as an active ingredient, for example in suspension or in solution, such as beclomethasone dipropionate or tiotropium bromide."

370.    If the '643 patent had issued with the claims contained within the original proposed claims 18-50, it may have been properly listable in the Orange Book because proposed claim 37 claimed a device ("[t]he inhaler of Claim 18") in combination with QVAR's active ingredient, beclomethasone dipropionate.

371.    But in February 2021, the PTO's patent examiner told Norton it had to choose: it could claim *either* the claims "drawn to methods of metering and treating" that appeared in the original proposed claims as Claims 1-17 and 55-61 *or* "Claims 18-50, drawn to an inhaler," *or* claims "drawn to the use of a metering valve." It could not claim all three of these categories; and it could not choose two.

372.    In July 2021, Norton chose to pursue the claims drawn to methods of metering and treating. It canceled all claims in the '643 patent's application that claimed an inhaler. In other words, Norton gave up the opportunity to claim, in the application that became the '643 patent, a device in combination with the active ingredient of QVAR.

373.    Each and every one of the relevant claims in the '643 patent, as issued, claims "*a method*" — not a drug product. And Teva and Norton knew that: they expressly chose to pursue method claims, rather than drug product claims, for this patent. Instead, it obtained a patent that, arguably, claimed a method of using QVAR.[3]

374.    Teva submitted the '643 patent to the FDA for listing in the Orange Book as a

---

[3] This allegation is not intended to suggest, imply, or raise the inference that the '643 was valid; in fact, it is likely invalid as obvious over prior art, since both the inhaler described in the method-of-use patent and the drug used had been commercialized more than one year prior to the application's priority date.

drug product patent. That means that Teva identified it as such in the '643 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*." Because the '643 patent does not claim an inhaler in combination with beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

375.     Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '643 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

376.     Because Teva wrongfully submitted the '643 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

377.     The '643 patent, if valid, does not expire until August 19, 2041.

378.     These false statements — that the '637 and '643 patents claim a drug product, rather than a method of use — are consequential. Because Teva submitted the '637 and '643 patents along with sworn statements that it was a drug product patent, and not a method-of-use patent, would-be generic competitors would be forced to submit a paragraph IV certification, and not a section viii carveout, if they sought to market a generic product prior to patent expiry. This (wrongfully) ensures that Teva has an opportunity to file a patent infringement suit  against a would-be competitor, automatically delaying approval of that competitor's ANDA for up to two and a half years.

**5.      Despite Teva's hard-switch product hop and the thicket of  wrongful patent listings it constructed around QVAR Redihaler, it still faced the risk of generic competition.**

379.     Teva did not discontinue QVAR for any safety or effectiveness reason. Rather, "Teva made a business decision to discontinue manufacturing" QVAR.

380.     In September 2018, Aurolife Pharma LLC, a subsidiary of Aurobindo Pharma USA, submitted a citizen petition to the FDA, asking whether Teva withdrew QVAR for safety or effectiveness reasons. In April 2019, the FDA answered "no."

381.     Because the FDA determined that Teva's decision to withdraw QVAR from the market had nothing to do with safety or effectiveness, it decided that QVAR would remain listed in the "Discontinued Drug Product List" in Orange Book, and that the agency would review and "approve abbreviated new drug applications (ANDAs) for QVAR . . . (beclomethasone dipropionate HFA) inhalation aerosol . . . if all other legal and regulatory requirements are met."

382.     This was good news for would-be competitors who had already begun the process of creating generic versions of QVAR. It was good news for patients, who could look forward to affordable generic versions of their asthma medication. And it was good news for purchasers of QVAR, who could look forward to substantial cost-savings when generic QVAR launched.

383.     But it was bad news for Teva: it meant that would-be generic competitors could obtain approval for generic QVAR, and that it could be automatically substituted for prescriptions written for just "QVAR," instead of "QVAR Redihaler." Teva's efforts to prevent competition were at risk.

**6.     November 2018 - present: Teva prevented generic QVAR competition by listing an additional 7 device-only patents in the Orange Book as QVAR drug product patents.**

384.     Teva knew that, so long as generic versions of QVAR could be approved by reference to its QVAR product, its stranglehold over the market for the QVAR franchise, and its already-two-years-prolonged monopoly were at risk.

385.     Beginning in November 2017 — after Teva had already announced they would discontinue QVAR — the companies submitted another seven patents for listing in the Orange Book as QVAR drug product patents, blockading competition to a drug they no longer sold. A

table of Teva's QVAR submissions is attached as Appendix B.

      **i.**      **Teva wrongfully caused the '587 patent to be listed in the Orange Book as a QVAR drug product patent.**

386.    In November 2017, Teva submitted a Patent Listing Form for U.S. Patent No. 9,808,587 (the '587 patent), entitled "Dose Counter for inhaler having an anti-reverse rotation actuator."

387.    The '587 patent issued November 7, 2017, and contained 22 claims: 3 independent claims and 19 dependent claims.

388.    None of the '587 patent's claims recite beclomethasone dipropionate. In fact, the words "beclomethasone dipropionate" do not appear anywhere in the patent. The '587 patent does not mention, let alone claim, beclomethasone dipropionate.

389.    Teva submitted the '587 patent as a drug product patent. That means that Teva identified it as such in the '587 patent Patent Listing Form by answering "yes" to Question 3.1 — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*."

390.    Because the '587 patent does not mention, let alone claim, beclomethasone dipropionate, it does not claim the drug product QVAR. Therefore, Teva's response to Question 3.1 was false.

391.    Because Teva's answer to Question 3.1 was false, the certification, made under penalty of perjury, that the information in the '587 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53, is also false.

392.    Because Teva wrongfully submitted the '587 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR Redihaler.

393.    The '587 patent does not expire until May 18, 2031.

### ii. Teva wrongfully caused the '509 patent to be listed in the Orange Book as a QVAR drug product patent.

394.    In July 2018, Teva submitted a Patent Listing Form for the '509 patent, resulting in the '509 patent being listed in the Orange Book under QVAR.

395.    Teva submitted this patent listing form at or around the time that it submitted the '509 patent Patent Listing form for QVAR Redihaler.

396.    As noted above, the '509 patent does not claim, let alone mention beclomethasone dipropionate.[4]

397.    Therefore, for the reasons described above, Teva's answer to Question 3.1 on the Patent Listing Form — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*" — was false. So too was the declaration signed by a Teva representative, swearing under penalty of perjury that the information in the '509 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53.

398.    Because Teva wrongfully submitted the '509 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR, where it will likely remain until the patent expires in 2031.

### iii. Teva wrongfully caused the '510 patent to be listed in the Orange Book as a QVAR drug product patent.

399.    In July 2018, Teva submitted a Patent Listing Form for the '510 patent, resulting in the '510 patent being listed in the Orange Book under QVAR.

400.    Teva submitted this patent listing form at or around the time that it submitted the '510 patent Patent Listing form for QVAR Redihaler.

---

[4] *See supra* § VI.B.4.v.

401.    As noted above, the '510 patent does not claim, let alone mention beclomethasone dipropionate.[5]

402.    Therefore, for the reasons described above, Teva's answer to Question 3.1 on the Patent Listing Form — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*" — was false. So too was the declaration signed by a Teva or Norton representative, swearing under penalty of perjury that the information in the '510 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53.

403.    Because Teva wrongfully submitted the '510 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR, where it will likely remain until the patent expires in 2031.

### iv.    Teva wrongfully caused the '156 patent to be listed in the Orange Book as a QVAR drug product patent.

404.    In October 2018, Teva submitted a Patent Listing Form for the '156 patent, resulting in the patent being listed in the Orange Book as a QVAR drug product patent.

405.    Teva made this submission at or around the same time it submitted the patent for listing under QVAR Redihaler.

406.    As noted above, the '156 patent does not claim, let alone mention beclomethasone dipropionate.[6]

407.    Therefore, for the reasons described above, Teva's answer to Question 3.1 on the Patent Listing Form — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*" — was false. So too was the declaration signed by a Teva or Norton representative,

---

[5] *See supra* § VI.B.4.vi.

[6] *See supra* § VI.B.4.vii.

swearing under penalty of perjury that the information in the '156 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53.

408.    Because Teva wrongfully submitted the '156 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR, where it will likely remain until the patent expires in 2031.

> **v.    Teva wrongfully caused the '512 patent to be listed in the Orange Book as a QVAR drug product patent.**

409.    In July 2020, Teva submitted a Patent Listing Form for the '512 patent, resulting in the patent being listed in the Orange Book as a QVAR drug product patent.

410.    Teva made this submission at or around the same time it submitted the patent for listing under QVAR Redihaler.

411.    As noted above, the '512 patent does not claim, let alone mention beclomethasone dipropionate.[7]

412.    Therefore, for the reasons described above, Teva and Norton's answer to Question 3.1 on the Patent Listing Form — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*" — was false. So too was the declaration signed by a Teva or Norton representative, swearing under penalty of perjury that the information in the '512 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53.

413.    Because Teva wrongfully submitted the '512 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR, where it will likely remain until the patent expires in

---

[7] *See supra* § VI.B.4.viii.

2031.

> ### vi.    Teva wrongfully caused the '808 patent to be listed in the Orange Book as a QVAR drug product patent.

414.    In March 2020, Teva submitted a Patent Listing Form for the '808 patent, resulting in the patent being listed in the Orange Book as a QVAR drug product patent.

415.    Teva made this submission at or around the same time it submitted the patent for listing under QVAR Redihaler.

416.    As noted above, the '808 patent does not claim, let alone mention beclomethasone dipropionate.[8]

417.    Therefore, for the reasons described above, Teva's answer to Question 3.1 on the Patent Listing Form — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*" — was false. So too was the declaration signed by a Teva or Norton representative, swearing under penalty of perjury that the information in the '808 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53.

418.    Because Teva wrongfully submitted the '808 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR, where it will likely remain until the patent expires in 2031.

> ### vii.    Teva wrongfully caused the '889 patent to be listed in the Orange Book as a QVAR drug product patent.

419.    In August 2020 — five years after Teva announced they would be discontinuing QVAR sales and four and a half years after they did so — they submitted a Patent Listing Form for the '889 patent, resulting in the patent being listed in the Orange Book as a QVAR drug

---

[8] *See supra* § VI.B.4.ix.

product patent.

420.    Teva made this submission at or around the same time it submitted the patent for listing under QVAR Redihaler.

421.    As noted above, the '889 patent does not claim, let alone mention beclomethasone dipropionate.[9]

422.    Therefore, for the reasons described above, Teva's answer to Question 3.1 on the Patent Listing Form — whether the patent "claim[s] the approved drug product *as defined in 21 CFR 314.3*" — was false. So too was the declaration signed by a Teva or Norton representative, swearing under penalty of perjury that the information in the '889 patent Patent Listing Form "complies with the requirements of" 21 C.F.R. § 314.53.

423.    Because Teva wrongfully submitted the '889 patent to the FDA, it wrongfully caused that patent — a patent that does not claim the drug product QVAR — to be listed in the Orange Book under the entry for QVAR, where it will likely remain until the patent expires in 2031.

**7.    January 2020: a generic company filed an ANDA, seeking approval to sell an affordable generic version of QVAR — but Teva does not sue.**

424.    On January 10, 2020, a generic company filed the first ANDA seeking to make, market, and sell an affordable generic version of QVAR.

425.    That company was Amneal Pharmaceuticals, Inc.

426.    Amneal filed a paragraph IV certification to each of the four device-only patents Teva had wrongfully listed in the Orange Book as claiming QVAR.

427.    Teva did not sue Amneal. Because Teva did not sue Amneal within 45 days of

---

[9] *See supra* § VI.B.4.xi.

receiving the first-filers' ANDA, they were not able to take advantage of the potentially two-and-a-half year stay of FDA approval.

428.    After the 45 day period passed, Amneal told investors that it expected to launch its generic QVAR product in 2021. It repeated that statement in each earnings call for the second and third quarters of 2020.

429.    Amneal also assured investors that it was not experiencing any problems in the approval process at the FDA that could alter its projected launch timeline.

430.    Amneal promised investors, during its third quarter 2020 investors' call, that "as [it] get[s] closer" to its anticipated launch date for generic QVAR, it "will be able to provide more details." In the fourth quarter of 2020, though, Amneal started hedging on its representations about a launch, suggesting it may not occur until 2025, and then fell silent about it after that.

**8.    February 2020: Teva defies the Orange-Book listing rule announced by the First Circuit.**

431.    On February 13, 2020, the United States Court of Appeals for the First Circuit issued an opinion in *In re Lantus Direct Purchaser Antitrust Litigation*. The First Circuit explained that "[t]he statute and applicable regulations call for the listing of only patents that claim the pertinent drug or a method of using the drug . . . ." And the court held that it is "readily apparent" that a patent that does not claim a drug's active ingredient or any method of using it, may not legally be listed in the Orange Book.

432.    The First Circuit told brand-name drugmakers that they could face antitrust liability for listing and asserting patents that did not satisfy the statutory listing requirements. It dismissed the concern from the *Lantus* defendant, Sanofi, that it could face antitrust liability if it failed to list a patent it was required to list, explaining:

> a company unsure about whether it must submit a patent for listing might protect itself from liability by submitting the patent and then not suing within forty-five days of any subsequent Paragraph IV certification, thereby ensuring that the mere listing would not slow down final FDA approval of a competitor's submission.

433. An NDA holder, like Teva, has an ongoing obligation to amend or correct patent listings. Pursuant to the FDA's regulations implementing the statutory listing requirements:

> If the NDA holder determines that a patent or patent claim no longer meets the requirements for listing in section 505(b)(1) or (c)(2) of the Federal Food, Drug, and Cosmetic Act . . . , the NDA holder is *required* to *promptly* notify FDA to amend the patent information or withdraw the patent or patent information and request that the patent or patent information be removed from the list.

434. Where an NDA holder is specifically "required by court order to amend patent information or withdraw a patent from the list, it must submit an amendment to its NDA . . . within 14 days of the date the order was entered." In any event, though, a brand-name drugmaker is obligated to "promptly" remove a patent from the Orange Book once it knows or has reason to know that its listing is improper.

435. The *Lantus* court recognized that, in some circumstances, a brand-name drugmaker may have a defense to antitrust liability for improper Orange Book listings if it "had a reasonable basis in regulatory policy to conclude, and in good faith concluded," that listing patents that claimed only a device and not a device in combination with a drug product as defined by the federal drug laws and regulations "was necessitated by concrete factual imperatives recognized as legitimate by" the FDA.

436. Long before, and certainly no later than, Teva knew or should have known that any QVAR- or QVAR Redihaler-listed patents that did not claim the active ingredient beclomethasone dipropionate were improperly listed. It was therefore obligated to promptly withdraw all patents that did not contain, within their claims, beclomethasone dipropionate.

Certainly after February 13, 2020, Teva knew it could no longer protect its improper listings —

or its failure to remove patents already improperly listed — by claiming refuge in the defense

announced in the Lantus decision.

437.    Had Teva complied with the law and/or heeded *Lantus*'s warning, it would have

done the following:

- Requested that the FDA withdraw from the Orange Book the listings under QVAR Redihaler of the '260, '712, '476, '509, '510, and '156 patents;

- Requested that the FDA withdraw from the Orange Book the listings under QVAR of the '289, '587, '509, '510, and '156 patents;

- Refrained from listing in the Orange Book under QVAR Redihaler the '512, '889, '637, and '643 patents; and

- Refrained from listing in the Orange Book under QVAR the '808, '512, and '889 patents.

- Refrained from suing within forty-five days of any subsequent Paragraph IV certification, thereby ensuring that the mere listing would  not  slow  down  final  FDA  approval of  a competitor's submission.

438.    Had Teva followed the law and/or heeded *Lantus*, there would be no patents

listed in the Orange Book as claiming QVAR, and, in spring 2020, no patents listed in the

Orange Book as claiming QVAR Redihaler. Generic competitors would have been more

motivated, and sooner, to seek permission to make, market, and sell generic versions of QVAR,

and possibly even QVAR Redihaler. No would-be generic competitor would have had to make a

paragraph IV certification. There would have been no threat of a patent infringement suit from

which Teva could leverage a pay for delay settlement; no lawsuits against would-be generic

competitors; no potentially thirty-month litigation delay in the approval of competitors' generic

products; no ability to bottleneck the market. Generic companies could come to the market as

soon as they obtained approval. This would have resulted in substantial savings to purchasers of inhalers containing beclomethasone dipropionate (i.e., QVAR, QVAR Redihaler, generic QVAR, and generic QVAR Redihaler), including the plaintiff and members of the class.

439.    But that is, unfortunately, not what happened.

**9.    Spring 2020: two other generic applicants — Cipla and Aurobindo — filed ANDAs, seeking approval to sell QVAR.**

440.    In the spring of 2020, after Amneal filed its generic QVAR ANDA, two more generic companies filed QVAR ANDAs.

**i.    Cipla Ltd. filed an ANDA, and notified Teva that it had filed paragraph IV certifications as to each of the improperly listed QVAR patents.**

441.    First, Cipla Ltd. ("Cipla") filed a generic QVAR ANDA sometime in late May or early-to mid-June 2020. The Cipla ANDA contained paragraph IV certifications to all of the patents then listed in the Orange Book: the '289 patent, the '587 patents, the '509 patent, '510 patent, the '156 patent, and the '808 patent.

442.    Cipla notified Teva of its paragraph IV certifications in a letter sent June 24, 2020.

443.    In July 2020, Teva listed the '512 patent in the Orange Book. On September 8, 2020, Cipla amended its ANDA, and submitted a second notice to Teva, advising the defendants that Cipla had added a paragraph IV certification as to that newly listed patent as well.

**ii.    Aurobindo Pharma Ltd. filed an ANDA, and notified Teva that it had filed paragraph IV certifications as to each of the improperly listed QVAR patents.**

444.    Second, Aurobindo Pharma Ltd. ("Aurobindo") and two of its subsidiaries filed a generic QVAR ANDA in late August or early September 2020. The Aurobindo ANDA contained paragraph IV certifications to all of the patents then listed in the Orange Book: the

'289 patent, the '587 patent, the '509 patent, the '510 patent, the '156 patent, the '808 patent, and the '512 patent.

> **10.    August 2020 - present: Teva institutes and maintains patent litigation against Cipla and Aurobindo.**

445.    As the *Lantus* court observed, if Teva's aim were to comply with the antitrust laws — and even if the *Lantus* decision did not give an unequivocal mandate that Teva's patents were not properly listable — it could have listed, but not sued within forty-five days of any subsequent Paragraph IV certification notice over, its inhaler device patents thereby ensuring that the mere listing would not slow down FDA approval of a competitors' submission.

446.    But Teva's goal was not to comply with the antitrust laws; its goal was to delay generic QVAR competition and unlawfully preserve its monopoly in the market for QVAR and QVAR Redihaler.

447.    On August 7, 2020, Teva sued Cipla in the United States District Court for the District of New Jersey alleging that Cipla infringed the '289 patent, the '587 patents, the '509 patent, the '510 patent, the '156 patent, and the '808 patent.

448.    On October 22, 2020, Teva sued Aurobindo in the District of New Jersey, alleging that Aurobindo infringed the '289 patent, the '587 patent, the '509 patent, the '510 patent, the '156 patent, the '808 patent, and the '512 patent.

449.    On October 23, 2020, Teva filed a second complaint against Cipla in the District of New Jersey alleging that Cipla infringed the '512 patent.

450.    All three lawsuits were consolidated on January 8, 2021.

451.    Teva should never have sued either company within forty-five days of their respective Paragraph IV certification notices since none of the asserted patents "claim[ed] the

drug" QVAR or its active ingredient beclomethasone dipropionate,[10] so a reasonable drug company in Teva's position would have known that they did not have standing to preemptively sue Cipla or Aurobindo for infringing Teva's wrongfully-listed device patents.

452.     But Teva did not sue Cipla and Aurobindo in a good faith effort to protect valid and valuable intellectual property properly listed in the Orange Book. Instead, Teva sued to prevent generic competition and, more importantly, to keep Cipla or Aurobindo from triggering Amneal's obligation to launch or forfeit its exclusivity.

>    **i.**     **All of the claims Teva asserted in the *Cipla* and *Aurobindo* litigations claimed an inhaler device, or just a portion of an inhaler device.**

453.     Teva asserted that Cipla and Aurobindo each infringed claim 1 of the '289 patent.

454.     Claim 1 of the '289 patent reads:

>    An inhaler for metered dose inhalation, the inhaler comprising:
>
>    >    a main body having a canister housing, a medicament canister, which is moveable relative to the canister housing and retained in a central outlet port of the canister housing arranged to mate with a canister fire stem of the medicament canister, and
>
>    >    a dose counter having an actuation member having at least a portion thereof located in the canister housing for operation by movement of the medicament canister, wherein the canister housing has an inner wall, and a first inner wall canister support formation extending inwardly from a main surface of the inner wall, and
>
>    >    wherein the canister housing has a longitudinal axis X which passes through the center of the central outlet port,
>
>    >    the inner wall canister support formation, the actuation member, and the central outlet port lying in a common plane coincident with the longitudinal axis X.

455.     Teva alleged that Cipla and Aurobindo each infringed claims 1, 12, and 13 of the

---

[10] *See supra* § VI.B.6.

'587 patent.

456.   Claim 1 of the '587 patent reads:

An inhaler for metered dose inhalation, the inhaler comprising:

a main body having a canister housing,

a medicament canister, which is moveable relative to the canister housing and retained in a central outlet port of the canister housing arranged to mate with a canister fire stem of the medicament canister, and

a dose counter having an actuation member having at least a portion thereof located in the canister housing for operation by movement of the medicament canister,

wherein the canister housing has an inner wall, and a first inner wall canister support formation extending inwardly from a main surface of the inner wall,

wherein the canister housing has a longitudinal axis X which passes through the center of the central outlet port, and

wherein the first inner wall canister support formation, the actuation member, and the central outlet port lie in a common plane coincident with the longitudinal axis X such that the first inner wall canister support formation protects against unwanted actuation of the dose counter by reducing rocking of the medicament canister relative to the main body of the inhaler.

457.   Claim 12 of the '587 patent reads:

An inhaler for metered dose inhalation, the inhaler comprising:

a main body having a canister housing,

a medicament canister, which is moveable relative to the canister housing and retained in a central outlet port of the canister housing arranged to mate with a canister fire stem of the medicament canister, and

a dose counter having an actuation member having at least a portion thereof located in the canister housing for operation by movement of the medicament canister,

wherein the canister housing has an inner wall, and a first inner wall canister support formation extending inwardly from a main surface of the inner wall,

wherein the canister housing has a longitudinal axis x which passes through the center of the central outlet port, and

wherein the first inner wall canister support formation, the actuation member, and the central outlet port lie in a common plane coincident with the longitudinal axis X such that the first inner wall canister support formation protects against dose count errors by reducing rocking of the medicament canister towards or away from the actuation member.

458.    And claim 13 of the '587 patent reads:

An inhaler for metered dose inhalation, the inhaler comprising:

a main body having a canister housing,

a medicament canister retained in the canister housing and movable relative thereto, and a dose counter, the dose counter having an actuation member having at least a portion thereof located in the canister housing for operation by movement of the medicament canister,

wherein the canister housing has an inner wall, and a first inner wall canister support formation extending inwardly from a main surface of the inner wall,

wherein the canister housing has an aperture formed in the inner wall through which the portion of the actuation member extends, and wherein the first inner wall canister support formation extends from the main surface of the inner wall to the aperture.

459.    Teva alleged that Cipla and Aurobindo each infringed claim 1 of the '509 patent.

460.    Claim 1 of the '509 patent reads:

A dose counter for an inhaler, the dose counter having a display tape arranged to be incrementally driven from a tape stock bobbin onto an incremental tape take-up drive shaft, the bobbin having an internal bore supported by and for rotation about a support shaft, at least one of the bore and the support shaft having a radially extending protrusion having a leading portion edge, a trailing

portion edge, wherein at least one of the leading portion edge and
the trailing portion edge are tapered, and a friction edge between
the leading portion edge and the trailing portion edge, wherein the
friction edge is substantially parallel to a longitudinal axis of the
support shaft and the leading portion edge and trailing portion edge
are not parallel to the longitudinal axis of the support shaft, and the
friction edge is resiliently biased into frictional engagement with
the other of the bore and support shaft with longitudinally
extending mutual frictional interaction and wherein the friction
edge extends further in a longitudinal direction than the protrusion
extends radially.

461.    Teva alleged that Cipla and Aurobindo each infringed claims 1, 10, and 20 of the

'510 patent.

462.    Claim 1 of the '510 patent reads:

An inhaler comprising a dose counter and dose counter viewing
window, the inhaler being configured to be readied by priming
before first use and the dose counter comprising:

    a tape system having a main elongate tape structure, dosing
    indicia located on the main elongate tape structure, tape
    positioning indicia located on the main elongate tape
    structure, a tape size marker located on the main elongate
    tape structure indicating a number of dosing indicia on the
    main elongate tape structure, and priming indicia located
    on the main elongate tape structure, the priming indicia
    being located between the dosing indicia and a first end of
    the main elongate tape structure and visible in the dose
    counter viewing window before priming before first use,
    and

    wherein the first end of the main elongate tape structure is
    fixed to a tape reel shaft and a second end of the main
    elongate tape structure is attached to a stock bobbin, and
    wherein the main elongate tape structure is around both the
    stock bobbin and tape reel shaft when the priming indicia is
    visible in the dose counter viewing window before priming
    before first use.

463.    Claim 10 of the '510 patent reads:

An inhaler comprising a dose counter and dose counter viewing
window, the inhaler being configured to be readied by priming
before first use and the dose counter comprising:

a tape system having a main elongate tape structure, dosing indicia located on the main elongate tape structure, tape positioning indicia located on the main elongate tape structure, and a tape size marker located on the main elongate tape structure indicating a number of dosing indicia on the main elongate tape structure, wherein the tape size marker is positioned between a first end of the main elongate tape structure and the tape positioning indicia,

wherein the first end of the main elongate tape structure is fixed to a tape reel shaft and a second end of the main elongate tape structure is attached to a stock bobbin, and

wherein the tape is around both the stock bobbin and tape reel shaft and a portion of the main elongate tape structure between the tape positioning indicia and the dosing indicia is visible in the dose counter viewing window before priming before first use.

464.    Claim 20 of the '510 patent reads:

An inhaler comprising a dose counter and dose counter viewing window, the inhaler being configured to be readied by priming before first use and the dose counter comprising:

a tape system having a main elongate tape structure, dosing indicia located on the main elongate tape structure, tape positioning indicia located on the main elongate tape structure so as to be visible in the dose counter viewing window before priming before first use, and priming indicia located on the main elongate tape structure, the priming indicia being located between the tape positioning indicia and the dosing indicia,

wherein a first end of the main elongate tape structure is attached to a stock bobbin and a second end of the main elongate tape structure is fixed to a tape reel shaft, and wherein the main elongate tape structure is around both the stock bobbin and tape reel shaft when the priming indicia is visible in the dose counter viewing window before priming before first use.

465.    Teva alleged that Cipla and Aurobindo each infringed claim 1 of the '156 patent.

466.    Claim 1 of the '156 patent reads:

A dose counter for a metered dose inhaler having a body arranged to retain a medicament canister of predetermined configuration for movement of the medicament canister relative thereto, the medicament canister containing an active drug; the dose counter comprising:

> a ratchet wheel having a plurality of circumferentially spaced teeth,

> an actuator comprising an actuator pawl arranged to engage with a first tooth of the ratchet wheel, wherein the actuator can be driven in response to canister motion to drive the ratchet wheel to rotate,

> a count pawl arranged to engage with a second tooth of the ratchet wheel, wherein as the ratchet wheel is driven by the actuator to rotate, the count pawl rides along a forward surface of the second tooth and resiliently jumps over the second tooth, and

> a dosage indicator associated with the count pawl,

> wherein the actuator is arranged to define a first reset position in which the actuator pawl is brought into engagement with the first tooth,

> wherein the actuator is further arranged such that, during a canister fire sequence, when the actuator is in a second position, which is after the first reset position and at a canister fire configuration, the medicament canister fires medicament before the dose counter reaches a count configuration, and when the actuator is in a third position after the second position, the count pawl resiliently jumps over the second tooth and the dose counter reaches the count configuration, whereby the dosage indicator has indicated a count,

> wherein, in the canister fire configuration, the actuator pawl is below a datum plane which passes through a shoulder of a valve stem block configured to receive the medicament canister.

467.    Teva alleged that Cipla and Aurobindo each infringed claim 1 of the '808 patent.

468.    Claim 1 of the '808 patent reads:

> A dose counter for an inhaler, the dose counter having a counter display arranged to indicate dosage information, a

drive system arranged to move the counter display incrementally in a first direction from a first station to a second station in response to actuation input, wherein a regulator is provided which is arranged to act upon the counter display at the first station to regulate motion of the counter display at the first station to incremental movements.

469.    And Teva alleged that Cipla and Aurobindo each infringed claim 1 of the '512 patent.

470.    Claim 1 of the '512 patent reads:

An inhaler for inhaling medicament, the inhaler having:

 A body for retaining a medicament canister; and

a dose counter, the dose counter having a moveable actuator and a chassis mounted on the body;

wherein one of the body and the chassis includes a plurality of apertures for receiving one or more pins on the other of the body and the chassis,

wherein either the pins or the apertures on the chassis are positioned on different sides of the chassis for stabilizing the chassis on the body, and

wherein the chassis comprises at least one of a pin or aperture heat staked to a respective aperture or pin of the body to mount the chassis to the body.

**ii.    Neither Cipla's nor Aurobindo's proposed inhaler devices infringed Teva's and Norton's device-only patents.**

471.    Each of the patents that Teva had listed in the Orange Book (and alleged that Cipla and Aurobindo infringed) claimed an inhaler containing a dose counter, or just a dose-counter mechanism for an inhaler device.

472.    The inhaler devices that Cipla and Aurobindo proposed to use with their generic QVAR products included a dose-counter mechanism.

473.    As far as Teva was concerned, that was reason enough to sue.

474.     Cipla offered Teva the opportunity to confidentially review portions of its ANDA, along with samples of its proposed inhaler device so that Teva could review in good faith whether Cipla's product actually infringed Teva's patents. Teva refused to accept the offer and just sued instead.

475.     Aurobindo, too, offered Teva confidential access to its application materials. But again, Teva did not take the opportunity to review the materials and evaluate whether it had a good faith and reasonable basis to sue. It just sued.

476.     Had Teva reviewed Cipla's and Aurobindo's ANDA offerings, it would have learned that neither company's inhaler infringed the patents: both companies had proposed to use inhalers with dose counters radically different than the dose counter described in Teva's device patents.

477.     Both Cipla and Aurobindo proposed to use an inhaler device with a gear-based dose-counter.

478.     Gear-based dose counters operate by turning a gear one click with each use. Doing so rotates a second gear with a counter on it that counts down the number of doses remaining in the cannister.

479.     Teva's device patents do not claim a gear-based dose counter.

480.     Instead, they claim a tape-based dose-counter. As the abstract to the '289 patent explains, for example, Teva's patents claim "[a] manually operated metered dose inhaler [that] includes a dose counter chamber *including a dose display tape* driven by a ratchet wheel . . . ."

    iii.    **If the claims in Teva's device patents were read broadly enough to claim Cipla's and Aurobindo's products, then the patents would be invalid over prior art.**

481.     Cipla's and Aurobindo's very different dose counters did not stop Teva, though. To back up its infringement allegations it proposed an interpretation of its dose-counter patents

that was so broad that, if correct, would render Teva's patents invalid.

482.     Gear-based dose-counters had been around for a long time by the time Cipla and Aurobindo filed their generic QVAR ANDAs. And the specific mechanism of action and components that the two generic manufacturers used in their dose-counters were described in patent applications that *Teva admitted* constituted prior art to its patents.

483.     "Prior art" has a specific meaning in patent law. To be patentable, an invention must be novel (meaning it must not have been thought of and either patented or practiced before) and non-obvious (meaning the idea for the invention must not be something that would occur to a person of ordinary skill in the art). Prior art refers to references-for example, prior patents or patent applications, scientific journal articles, and published research-that are used to determine the novelty and/or non-obviousness of claimed subject matter in a patent application. If prior art renders a claimed invention not novel or obvious then that claim in a patent is invalid.

484.     If Teva's argument was correct-if its tape-based dose-counter patents were broad enough to cover Cipla's and Aurobindo's gear-based dose counters-then those patents would have been invalid as obvious over prior art.

### iv.     Teva's infringement arguments were not in good faith and intended only to delay competition.

485.     Cipla argued from the very outset of the case that Teva's claims were so utterly meritless the lawsuit was a farce. When Cipla answered Teva's complaint, it asserted counter-claims, arguing that each of Teva's patents was invalid or not infringed. Teva answered Cipla's counterclaims.

486.     Then Cipla moved for judgment on the pleadings,[11] arguing that Teva's suit

---

[11] The court does not appear to have ruled on Cipla's motion.

"should never have been filed because Cipla's ANDA Product does not infringe any asserted patent," and, if Teva "tr[ied] to construe any claims to cover Cipla's ANDA Product, those claims would be invalid as covering the prior art."

487.    In opposition, Teva argued that, simply because Cipla filed an ANDA, Teva was *entitled* to a two-and-a-half-year-long litigation process, and that therefore, the court should deny Cipla's motion:

> An abbreviated new drug application ("ANDA") is fundamentally compromise; it offers a streamlined regulatory process in exchange for a thirty-month stay of approval while a court adjudicates accelerated claims of patent infringement.  Having taken advantage of the former, Cipla may not decline to participate in the latter, statutorily-prescribed [sic] litigation.

488.    In other words, Teva argued that whatever the merit of Cipla's motion for judgment on the pleadings, Cipla must wait for two and a half years to adjudicate the issue.

489.    Teva's argument is flat wrong. Under the FDCA, Teva is not guaranteed two and a half years of delay just because it filed suit (over its wrongfully listed patents). Rather, the statute provides that, a suit over a paragraph IV certification stays FDA approval *until the earlier of* (a) two and a half years or (b) *a court decision finding that the patent is invalid or not infringed*. Option "b" has no timeframe: the court decision can come from a ruling after trial, or at summary judgment, or even as Cipla sought-on the pleadings. And it is entitled to no litigation stay at all unless it has valid, objectively reasonable claims that it presses in good faith.

**v.    Teva's litigation tactics were focused on delay, not success.**

490.    Although Teva initially sued both Cipla and Aurobindo over seven patents each, once it had assured itself a delay in competition while the supposed patent disputes played out, it abandoned some claims.

491.    On June 1, 2021, Teva and Cipla stipulated to the dismissal of Teva's

infringement claims as to the '509 and '510 patent (and Cipla's counterclaims of noninfringement and invalidity).

492.    On May 31, 2022, and June 6, 2022, Teva stipulated with Aurobindo and Cipla, respectively, to dismiss Teva's infringement claims as to the '512 patent (and Aurobindo's and Cipla's counterclaims). In doing so, Teva expressly stipulated that the generic companies' products did not infringe the patent.

493.    On September 21, 2022, Teva and Aurobindo stipulated to the dismissal of Teva's infringement claims (and Aurobindo's counterclaims) as to the '156 patent. Again, Teva expressly stipulated that Aurobindo's product did not infringe the patent.

494.    On October 11, 2022, Teva and Aurobindo stipulated to the dismissal of their claims as to the '509 and '510 patents.

495.    Around the same time, Teva offered Cipla a covenant not to sue for infringement of Teva's '156 patent, if Cipla dismissed its corresponding counterclaims. But this offer was never memorialized in a stipulation because the parties disagreed on the language to be used. Specifically, Teva refused to include language referencing a finding of non-infringement.

496.    On October 31, 2022, Teva filed a motion to dismiss Cipla's claims and counterclaims as to the '156 patent, claiming that the court lacked subject matter jurisdiction over the claims.

497.    Teva argued that its covenant not to sue stripped the court of subject matter jurisdiction to adjudicate the parties' claims in connection with the '156 patent. Ordinarily, a covenant not to sue would not strip a court of jurisdiction over related counterclaims: in the Hatch-Waxman context, the court could retain jurisdiction so long as a judgment for the defendant on its counterclaims could potentially result in a trigger a first-filer losing its

exclusivity due to the forfeiture provisions under the Hatch-Waxman scheme.

498.    But, as Teva told the court, there were at least *three* patents that blocked Amneal from launching: the '509 patent, '510 patent, and '156 patent. Because Cipla had already stipulated to dismissing its '509 and 510 patent claims, Teva argued, even a judgment for Cipla on its '156 patent counterclaims would not break the bottleneck to generic entry. The district court agreed, and dismissed Cipla's '156 patent counterclaims.

499.    That admission, when viewed against Teva's prior stipulations in the patent case, reveals its strategy. Teva freely gave stipulations of non-infringement for certain patents, but not those that were impeding Amneal — namely the '509 patent, '510 patent, and '156 patent:

| Asserted Patents | Dismissed as to | | Noninfringement Stipulation as to | |
|---|---|---|---|---|
| | Cipla | Aurobindo | Cipla | Aurobindo |
| '289 patent | | | | |
| '587 patent | | | | |
| '509 patent | 6/1/2021 | 10/11/2022 | no | no |
| '510 patent | 6/1/2021 | 10/11/2022 | no | no |
| '156 patent | 11/11/2022 | 9/21/2022 | *no* | yes |
| '808 patent | | | | |
| '512 patent | 6/6/2022 | 5/31/2022 | *yes* | yes |

500.    By suing over, and then declining to stipulate with Cipla that Cipla's generic product did not infringe the '509 patent, '510 patent, and '156 patent, Teva was able to maximize the delay in generic entry. Teva took full advantage of its ability to delay generic competition for up to two and a half years simply by suing; and then (as those two and a half years ran out) ensured that, regardless of the substantive outcome of the remaining patent disputes, the case would not curtail its ability to delay competition.

501.    And because of Teva's machinations, it gained the ability to delay generic QVAR

competition indefinitely.

502.    Teva knew this based on its own experience as a generic company.

503.    Years earlier, Teva was the first-filer for another drug, Kytril (granisetron

hydrochloride). It filed a paragraph IV certification to one Orange Book-listed patent. The brand-

name drug maker did not sue Teva for patent infringement, nor did it sue the later ANDA filers.

And neither Teva nor any other generic applicant sought a declaratory judgment that the relevant

patent was invalid or not infringed. After Teva's generic Kytril ANDA received approval, the

question arose: by what date would Teva need to launch to avoid forfeiting its first-filer

exclusivity?

504.    The FDA determined that Teva *could not* forfeit its exclusivity because there was

no litigation over the relevant patent. Starting from the plain language of the statute, the agency

explained that

> Application of the 'failure to market' forfeiture provisions in
> section 505(j)(5)(D)(i)(I) requires a series of earlier of/later-of
> analyses. The statute directs that a forfeiture event occurs when the
> first applicant fails to market the drug by the later of two dates.

The first of those two dates (the "(aa) date") "is calculated . . . by determining the earlier of . . .

75 days after the first applicant's ANDA is approved or . . . 30 months after the date of

submission of the first applicant's ANDA." The second date (the "(bb) date") is the later of the

dates on which

> (a) a court enters a final decision that the patent is invalid
> or not infringed, (b) a court signs a settlement order or
> consent decree entering final judgment that includes a
> finding that the patent is invalid or not infringed, or (c) the
> patent information for the listed drug is withdrawn by the
> NDA holder.

505.    Applying this rule to Teva's generic Kytril situation, the FDA determined that the

(aa) date was December 1, 2006, thirty months after Teva filed its ANDA. But given that neither

Teva nor any other generic Kytril applicant was embroiled in litigation over the Kytril patents, there was *no* (bb) date.

506.   The FDA determined that, under those circumstances, a first-filer's exclusivity could never be forfeited. In reaching this conclusion, the FDA acknowledged a loophole in the drug laws:

> Inherent in the structure of the "failure to market" forfeiture provisions is the possibility that a first applicant would be able to enter into a settlement agreement with the NDA holder or patent owner in which a court does not enter a final judgment of invalidity or non-infringement (i.e., without [(bb) date] occurring), and that subsequent applicants would be unable to initiate a forfeiture with a declaratory judgment action. This inability to force a forfeiture of 180-day exclusivity could result in delays in the approval of otherwise approvable ANDAs . . . *This potential scenario is not one for which the statute currently provides a remedy*.

507.   By choosing not to sue Amneal and then ensuring that the patents blocking Amneal could not be adjudicated in the Cipla and Aurobindo litigation, Teva manufactured a regulatory quandary analogous to Kytril, assuring that Amneal's obligation to either launch or forfeit could not be triggered.

508.   For Amneal, the (aa) date was July 10, 2022, thirty-months after it filed its ANDA. Because Teva (i) did not sue Amneal and (ii) stripped the *Teva v. Cipla* court of jurisdiction over three key patents blocking Amneal, there could be no court decision or settlement finding those patents invalid or not infringed, and, thus, no (bb) date for Amneal.

509.   In the generic Kytril situation, the FDA noted, there was no evidence that Teva was trying to "park[]" its exclusivity "as a result of" a pay-for-delay agreement "with the NDA holder and/or patent owner." Here, in contrast, there is evidence that Teva was in fact trying to (and successfully did) delay generic competition for QVAR.

   **11.   Date unknown: Teva entered into an agreement with Amneal to delay**

**generic QVAR competition for an unknown amount of time.**

510.     As Cipla argued against Teva's motion to dismiss its '156 patent counterclaims, Cipla acknowledged that it had agreed to dismissal of its '509 patent and '510 patent counterclaims because it believed that Amneal would have launched before late 2022 — a reasonable assumption since Amneal had publicly represented that it planned to launch in 2021.

511.     To date, Amneal still has not launched its generic QVAR product — more than three years after filing its ANDA, and two years after telling the investing public it would.

512.     The circumstances regarding Amneal's continued absence from the market suggest that Teva reached an agreement with Amneal to delay its launch — thereby delaying all competition with its blockbuster QVAR franchise in exchange for some form of valuable consideration passing from Teva, the patent holder, to Amneal, the patent challenger. The exact form of consideration is unknown but can take any one or more forms including, for example, cash payments, favorable marketing deals on other products, favorable consulting arrangements, and agreements not to compete with an authorized generic when generic entry finally occurs.

513.     When Amneal submitted its application on January 10, 2020, it provided paragraph IV certifications to all of Teva's listed patents related to QVAR. Otherwise, Amneal could not have represented to investors that it intended to come to market in 2021. Each of the QVAR-related patents listed in the Orange Book at the time expired in 2031. Had Amneal filed a paragraph III certification as to even one of those patents, it would have been barred from the market for a decade.

514.     Teva did not sue Amneal within 45 days of receiving the first-filer's paragraph IV notice. Indeed, Teva did not sue Amneal at all. Because Teva did not sue, it could not trigger a delay in Amneal's launch of up to 30 months, and Amneal was free to come to the market as soon as it could obtain FDA approval for its product.

515.    In addition, Amneal did not experience any hold-ups with the FDA during the agency's substantive review of its application.

516.    If this were the whole story, then under the FDCA, the FDA's regulations, and the agency's practices, Amneal would have obtained approval for its drug within thirty months after filing its application — i.e., by July 10, 2022. The FDA would have assured that its substantive review was complete, such that it could issue an approval by that deadline.

517.    And Amneal would have been incentivized to launch as soon as possible thereafter — particularly because the other generic applicants, Cipla and Aurobindo, were tied up in litigation, which would prevent them from launching competing generic products until December 2022 and April 2023, respectively. Had Amneal obtained approval in 2021, as it expected, and launched, it would have been able to enjoy much more than just 6 months of lucrative generic exclusivity.

518.    But subsequent developments show that, behind the scenes, something more was going on.

519.    For example, by late 2020 and early 2021, Amneal first hedged on its prior representations that it expected a 2021 launch, saying that it would launch generic QVAR (and other unspecified inhaler products) sometime between 2021 and 2025. Thereafter, Amneal fell silent about the application, declining to mention it in either its SEC filings or in calls with investors.

520.    Amneal did not launch generic QVAR in 2021,  2022, or 2023. Indeed, as of the date of this Complaint, Amneal has not launched its generic QVAR product.

521.    Teva's own admissions at the final pretrial conference in the *Teva v. Cipla* matter shed some light on why. At the conference on November 10, 2022, Teva told the court (and

Cipla) that at least three patents were blocking Amneal from coming to market: the '509 patent, the '510 patent, and the '156 patent.

522.    A patent can block a generic company from coming to market in the following three  scenarios: (1) the generic drugmaker files a paragraph III certification, thereby promising to wait out the expiry of the patent before launching; (2) the brand-name drugmaker obtains a judgment in a Hatch-Waxman patent suit that the patent is valid and infringed; and (3) the generic company and the brand-name drugmaker enter into an agreement stipulating that the patent is valid and infringed.

523.    Scenario 1 cannot be the case here. Amneal did not file any paragraph III certifications when it submitted its generic QVAR ANDA. It encountered no manufacturing issues that would have raised concerns about its ability to obtain timely approval. And it would have been incentivized to launch as soon as possible, as it had promised its investors, to take the greatest advantage of its exclusivity in the marketplace. It would not have revised any of its patent certifications from paragraph IV certification to a paragraph III certification (absent some significant incentive to do so).

524.    Scenario 2 is also impossible. Because Teva did not sue Amneal for patent infringement, and because it ensured neither Cipla nor Aurobindo could obtain a judgment on the '509 patent, '510 patent, or '156 patent, there could be no judgment of non-infringement or invalidity.

525.    That leaves scenario 3 as the only plausible explanation for the facts as they exist: Teva and Amneal reached an agreement that induced Amneal to quit its plans to launch in 2021 and to delay its launch until possibly 2025 or even beyond.

526.    Typically, those agreements come in the form of a settlement agreement resolving

a lawsuit. But as Teva well knew, a settlement outside of the litigation process presents better opportunities to delay, because if there is no litigation in which a judgment can be entered or a settlement reached, then there is no limit on how long a first-filer can delay.

527. Scenario 3 also explains why there has been no approval of Amneal's ANDA or any announcement that Amneal has forfeited its exclusivity. By reaching an agreement outside of the litigation context, Teva ensured that there was no (bb) date — i.e., no date of a final judgment of invalidity or non-infringement or a settlement agreement allowing for generic entry- that would require Amneal to either launch or forfeit exclusivity. Accordingly, there is no forfeiture date when Amneal must launch its product. With no impending deadlines or forfeiture dates, the FDA has prioritized other, more time-sensitive applications.

528. In its second quarter 2023 earnings presentation and call with investors, Cipla acknowledged, for what appears to be the first time, that it was the QVAR first-filer. And it disclosed that it would not be bringing its generic QVAR version to market until 2024.

**12. November - December 2022: Teva takes Cipla to trial and settles with Aurobindo.**

529. From November 16 to 18, 2022, Teva and Cipla held a bench trial in the U.S. District Court for the District of New Jersey limited to certain claims of the '289, '587, and '808 patents.[12]

530. In the ways that matter, the trial was an act in futility. Because Teva excised from the case those patents that affected Amneal's exclusivity, a judgment of non-infringement or invalidity in Cipla's favor on any of the patents in the case could not trigger Amneal's obligation

---

[12] At trial, Teva asserted Cipla infringed independent claim 1 and dependent claims 2, 4, 6, and 7 of the '289 patent, independent claims 1 and 12, and dependent claims 2, 4, 6, and 7 of the '587 patent, and dependent claim 28 which depends from claims 1 and 27 of the '808 patent.

to launch or forfeit exclusivity.

531.    Perhaps because of that futility, Aurobindo settled with Teva on December 22, 2022. Teva and Aurobindo have kept the terms of their settlement secret.

532.    On June 21, 2023, the district court issued its opinion finding that on the preponderance of evidence standard Cipla's ANDA product infringes each of the asserted claims of the '289, '587, and '808 patents and that on the clear and convincing evidence standard Cipla had not proven those patents were invalid.

533.    In rendering its opinion, the district court acknowledged that Cipla had valid challenges to the validity and infringement of Teva's patents, but did not credit them because, the Court found, Cipla's expert through whom those challenges came did not provide sufficient details to support such challenges.

534.    The Court relied heavily on the testimony provided by the parties' respective competing expert witnesses and, in general, favored the testimony provided by Teva's expert over the testimony provided by Cipla's expert, sometimes to the exclusion of other valid evidence. For example, the district court recognized Cipla had valid challenges to the experiments conducted by Teva's expert. It noted that the experiments that Teva's expert performed "may not be perfect tests to prove an 'airtight' infringement case," and that Teva's expert "could have performed better experiments to support his conclusions."   However,  it discounted Cipla's noninfringement defense because Cipla's expert did not conduct his own tests.

535.    Concerning invalidity, the district court accepted Teva's argument that Cipla had failed to prove that a person of ordinary skill in the art would have selected the prior art references Cipla relied on to show the asserted patent claims were invalid. But in doing so, it

ignored the fact that Teva's own expert conceded the dose counter in the principal prior art reference — International Patent Publication No. WO 2007/124406 — relied upon by Cipla 'looks the same' as the dose-counter used in Cipla's product. The district court also apparently discounted Cipla's expert's discussion of the state of the art at the time of the invention showing why there was a motivation to select and combine the prior art Cipla relied upon to challenge the validity of the asserted patent claims.

536.    Cipla has timely filed a notice of appeal of the district court judgment to the United States Court of Appeals for the Federal Circuit. There are strong indications — such as the district court's failure to acknowledge some of the evidence Cipla elicited and key concessions made by Teva's own expert — that the district court judgment will not be affirmed.

537.    Regardless, the outcome of the Cipla litigation does not indicate that Amneal (or another company) could not prevail in showing Teva's patents invalid or not infringed. First, patents are never held "valid" and are only found "not invalid" over the facts and arguments presented.[13]  Second, the fact that, according to the district court in Cipla, Cipla's product infringed Teva's patent does not mean that Amneal's product would also infringe.[14]

538.    And third, the district court's decision hinged upon its assessment of Cipla's expert's credibility. It acknowledged the persuasive force of several arguments Cipla made, yet did not credit those arguments because the supporting proof came from a witness the court found not credible. Another generic drug company, presenting the same case through a more

---

[13] *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009) (Courts "do not declare patents to be valid"; they "only declare that they have not been proved to be invalid "); *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 627 (Fed. Cir. 1984) ("A patent is not held valid for all purposes, but, rather, not invalid on the record before the court.").

[14] *Fantasy Sports v. Sportsline.com*, 287 F.3d 1108, 1117-18 (Fed. Cir. 2002) ("[I]n every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred.").

credible witness, would likely prevail in showing that Teva's patents could not bar overdue generic competition.

**13.     Teva plans to prolong its unlawful monopoly even further with a second product hop.**

539.     So far, Teva's anticompetitive scheme, as set forth above, has delayed availability of affordable generic QVAR for as much as five years (and counting) beyond the life of its latest-expiring lawfully listed drug product patent. But for Teva, that is not enough.

540.     Teva has announced that it intends to execute a *second* product hop in its QVAR franchise in the coming years.

541.     Since launching QVAR Redihaler, Teva developed a new inhaler in 2020, called the Digihaler. The Digihaler is a "smart" inhaler "with built-in sensors that automatically capture objective inhaler use data" and shares that information with an app on the patients' phone.

542.     Teva already uses the Digihaler with some of its other respiratory products, such as ProAir (albuterol sulfate). Since obtaining approval for its ProAir Digihaler in January 2019, Teva has listed *twenty-two* patents in the Orange Book as claiming ProAir Digihaler. The expiry dates on these patents extends as far as 2041.

543.     In its recent Fiscal Year 2022 SEC filing, Teva has announced its intention to combine its Digihaler device with its QVAR drug product. Teva disclosed that QVAR Digihaler is in the "pre-submission" phase of development — meaning that clinical trials are complete, but Teva has not yet submitted an NDA or a supplemental NDA to the FDA asking for approval.

544.     If Teva succeeds in continuing with its anticompetitive scheme — staving off generic competition long enough to switch its product once more from the QVAR Redihaler to a QVAR Digihaler — it could thwart competition for almost two more decades, stretching its anticompetitive generic delay to 26 years.

## VII.   EFFECTS OF THE SCHEME ON COMPETITION AND DAMAGES TO THE PLAINTIFF AND THE CLASS

545.   Teva's scheme to thwart competition has proved lucrative for the company. It has sold approximately $6.2 billion in QVAR and QVAR Redihaler products since 2015. This is hundreds of millions, if not billions of dollars more in sales that Teva could have made if it had not engaged in a sweeping scheme to impair competition. If Amneal's generic product had entered the market in 2021, it would have driven prices down and eroded Teva's market share. And if Teva had not stuffed the Orange Book with unlistable wrongly-listed device patents starting in 2014, generic companies would have been motivated to file ANDAs with Paragraph III certifications to the '432 patent, i.e. certifying they would not launch until the '432 drug substance patent expired on July 7, 2015. This way, generic companies could receive tentative approval prior to July 2015, and be poised to enter the QVAR market (in 2015 worth $392 million in global sales) at the earliest possible time.  Consistent with normal dynamics in the pharmaceutical industry when involving drugs with substantial sales like those of QVAR and where the Orange-Book listed patents are near expiration, multiple generic manufacturers would race to enter this lucrative market, resulting in earlier price decreases and erosion.

546.   Teva's anticompetitive scheme impaired and delayed the sale of affordable generic versions of QVAR in the United States, freeing Teva to sell QVAR and QVAR Redihaler at artificially high prices.

547.   But for Teva's anticompetitive conduct, at least one generic manufacturer would have entered the marketplace and competed with Teva's brand-name QVAR by 2021 at the latest — and more likely multiple generic manufacturers as early as 2015, when Teva's only lawfully listed drug product patent expired.

548.   Consequently, but for Teva's anticompetitive conduct, the plaintiff and other

members of the class would have been able to (a) purchase generic QVAR products instead of Teva's expensive QVAR and QVAR Redihaler products for some or all their beclomethasone dipropionate HFA needs; and (b) paid a lower price for their beclomethasone dipropionate HFA needs.

549.    Had Teva not engaged in anticompetitive conduct, the market would have embraced generic QVAR — which is just as safe and effective as QVAR and QVAR Redihaler at a fraction of the price. Because of state substitution laws, generic QVAR products would have captured 90% of the market, and ushered in substantial cost savings to the plaintiff and members of the class. As a result of Teva's anticompetitive scheme, however, generic competition for QVAR and QVAR Redihaler have been completely thwarted.

550.    During the relevant period, the plaintiff and other purchasers paid for substantial amounts of QVAR and QVAR Redihaler; the prices the plaintiff paid for these products were substantially greater than the prices they would have paid but for the unlawful conduct alleged herein.

551.    As a result, the plaintiff and other direct purchasers have incurred substantial losses, the exact amount of which will be the subject of proof at trial.

## VIII.   MARKET POWER AND MARKET DEFINITION

552.    Teva wrongfully acquired, locked in, and exploited monopoly power in the market for beclomethasone dipropionate HFA products. At all relevant times, it had the power to raise or maintain the price of QVAR and QVAR Redihaler to supra-competitive level without losing enough sales to make supra-competitive prices unprofitable.

553.    At all relevant times to this case, there were other inhaled corticosteroid medications for asthma maintenance available in the market, including, for example, Flovent Diskus and Flovent HFA (fluticasone) and Pulmicort Flexhaler (budesonide). But none of these

other asthma maintenance medications were equivalent to one another, nor were they equivalent to QVAR or QVAR Redihaler.

554.    The other products contained different drug substances (active ingredients): each contained a different molecule with a different mechanism of action.

555.    At all relevant times, QVAR and QVAR Redihaler were the only products on the market that contained the active ingredient beclomethasone dipropionate.

556.    A small but significant, non-transitory price increase to the price of QVAR or QVAR Redihaler would not have caused a significant loss of sales.

557.    QVAR and QVAR Redihaler do not exhibit significant, positive cross-elasticity of demand with respect to the price of any other inhaled corticosteroid asthma maintenance product, other than those containing beclomethasone dipropionate.

558.    Teva needed only to control QVAR and QVAR Redihaler and their generic equivalents, and no other products, in order to maintain QVAR and QVAR Redihaler supra-competitive prices profitably without losing substantial sales. The only market event that would render Teva unable to profitably maintain supra-competitive prices would be the entry of a generic beclomethasone dipropionate HFA product.

559.    Teva also sold QVAR and QVAR Redihaler at prices well above marginal costs, and in excess of competitive prices; as a result, it enjoyed high profit margins with the price more than 60% higher than the cost of production.

560.    Teva has had, and has exercised, the power to exclude competition to QVAR and QVAR Redihaler.

561.    Teva enjoyed, at all relevant times, high barriers to entry with respect to QVAR and QVAR Redihaler.

562.    There is direct evidence of Teva's market power and the anticompetitive effects of its scheme sufficient to show Teva's ability to control the prices of, and exclude competition for, QVAR and QVAR Redihaler, without the need to define the relevant antitrust market.

563.    The direct evidence includes: (a) the fact that competing beclomethasone dipropionate producers would have entered the market at a substantial discount to the price of QVAR and QVAR Redihaler but for Teva's anticompetitive conduct; and (b) the gross margin on QVAR and QVAR Redihaler were, at all times, substantial enough to show market power.

564.    To the extent the plaintiff may be required to plead and prove Teva's monopoly power by defining a relevant product market, the plaintiff alleges that the relevant antitrust market is the beclomethasone dipropionate market.

565.    The United States, its territories, and the District of Columbia constitute the relevant geographic market.

566.    Teva's share in the relevant market was 100% at all relevant times, continuing to today.

## IX.    MARKET EFFECTS

567.    Teva willfully and unlawfully maintained its market power by engaging in an overarching scheme to exclude competition. Teva designed this scheme to delay competition on the merits, for the anticompetitive purpose of thwarting, or at least delaying, competition against its QVAR product franchise. As a result of the scheme, Teva was able to maintain supracompetitive prices for QVAR and QVAR Redihaler.

568.    Teva's overarching anticompetitive scheme consisted of 7 parts: (1) as the expiry over its lawful patent monopoly approached, Teva wrongfully listed two device-only patents in

the Orange Book[15] to buy it more time to (2) execute a hard-switch product hop from QVAR to

QVAR Redihaler.[16] Then Teva (3) stuffed the Orange Book with improper patent listings for

both QVAR Redihaler (ten patents)[17] and QVAR (nine patents[18]).[19] It next (4) leveraged those

improperly-listed patents in litigation against Cipla and Aurobindo to improperly gain an

automatic stay of FDA final approval of Cipla's and Aurobindo's ANDA filings;[20] (5) exploited

a loophole in the forfeiture provisions to enable Amneal to park its exclusivity indefinitely.[21]

And Teva (6) formed an illicit agreement with Amneal to delay generic QVAR competition to

take advantage of that loophole[22] in the hopes of (7) executing another product hop that would

prolong its wrongful monopoly for another two decades.[23]

569.    These acts, in combination and individually, were undertaken to serve Teva's

anticompetitive aims.

570.    Teva's acts and practices described in this complaint had the purpose and effect

of unreasonably restraining competition and injuring competition by preventing competition for

Teva's QVAR franchise. They allowed Teva to wrongfully maintain its monopoly and exclude

competition in the market for QVAR, QVAR Redihaler, and another beclomethasone

dipropionate HFA products. This harmed the plaintiff and other members of the class.

---

[15] *See supra* § VI.B.2.

[16] *See supra* § VI.B.3.

[17] The improperly listed QVAR Redihaler patents were (at least) the '627 patent, the '260 patent, the '712 patent, the '476 patent, the '509 patent, the '510 patent, the '156 patent, the '512 patent, and the '889 patent.

[18] The improperly listed QVAR patents were the '627 patent, the '289 patent, the '587 patent, the '509 patent, the '510 patent, the '156 patent, the '808 patent, the '512 patent, and the '889 patent.

[19] *See supra* §§ VI.B.4 & 6.

[20] *See supra* §§ VI.B.9.i - iv, V.B.11.

[21] *See supra* § VI.B.9.v.

[22] *See supra* § VI.B.10.e

[23] *See supra* § VI.B.12.

571.    Teva's conduct has delayed competition unlawfully, and wrongfully enabled Teva to sell its QVAR and QVAR Redihaler products without competition from more affordable generic versions of the drugs. But for Teva's illegal conduct, one or more competitive beclomethasone dipropionate HFA products would have entered the market sooner.

572.    For example (but without limitation), had Teva not engaged in the unlawful conduct described in this complaint, (a) an affordable generic beclomethasone dipropionate product would have become available in or around July 2015, when the patent claiming beclomethasone dipropionate HFA expired, and in any event no later than 2021, when Amneal intended to launch (prior to Teva's unlawful agreement with the first-filer); and (b) the plaintiff and other members of the class would have substituted purchases of expensive brand-name QVAR and QVAR Redihaler with lower-cost generic versions of those drugs.

573.    Teva's illegal scheme to foreclose competition to its QVAR franchise from competing generic inhaled beclomethasone dipropionate products caused the plaintiff and all members of the class to pay more than they would have for prescriptions of QVAR franchise products absent the illegal conduct.

574.    When a generic drug enters a previously monopolized market, they are priced below the cost of their brand-name counterparts. As more generic drugs enter the market, the price drops even further; and the price of the brand-name drug may drop slightly to try to keep some of its sales from being eroded by its new generic competitors. Because state substitution laws drive prescription dispensing to these less expensive generic products, for which the plaintiff and members of the class pay less. Therefore, brand-name drugmakers have a financial interest in delaying the onset of generic competition.

575.    Teva's unlawful conduct deprived the plaintiff and members of the class of the

benefits of competition that the federal antitrust laws are designed to protect.

## X.      ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE

576.    During the relevant time period, Teva sold, and will continue to sell, QVAR and QVAR Redihaler across state lines.

577.    During the relevant time period, the plaintiff and members of the class paid for substantial amounts of QVAR and QVAR Redihaler at supracompetitive prices. They will begin to pay for substantial amounts of beclomethasone dipropionate from Amneal, Cipla, Aurobindo, and any other subsequent generic competitors, once the anticompetitive effects of Teva's conduct cease.

578.    As a result of Teva's illegal conduct, as described in this complaint, the plaintiff and members of the class were compelled to pay, did pay, and will continue to pay, artificially inflated prices for their QVAR requirements.

579.    During the relevant time period, Teva effected its overarching anticompetitive scheme, as described in this complaint, using the United States mail, interstate carriers, interstate and foreign travel, and interstate and foreign wire commerce.

## XI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Monopolization in Violation of Section 2 of the Sherman Act, Unlawful
Maintenance of Monopoly Power Through an Overarching
Scheme To Prevent or Delay Generic Competition
*Against Teva***

580.    The plaintiff incorporates by reference the preceding allegations.

581.    At all relevant times, Teva possessed monopoly power in the relevant market.

582.    Teva manufactured, marketed and sold the various formulations of QVAR described herein in the United States.

583.    During the relevant period, Teva willfully and unlawfully maintained its

monopoly power by engaging in exclusionary conduct that discouraged rather than encouraged competition on the merits. As explained in detail above, Teva engaged in an exclusionary scheme that included, *inter alia*, each of the following (at various times):

    a.   coercing the conversion of the QVAR market from QVAR to QVAR Redihaler Film, which is not safer or more effective than QVAR;

    b.   withdrawing QVAR from the market;

    c.   unlawfully causing patents that do not cover QVAR to be listed in or to be maintained in FDA's Orange Book;

    d.   prosecuting patent litigation against generic QVAR ANDA applicants for purposes of thwarting and delaying competition from generic QVAR by taking advantage of the particular regulatory framework governing approval of generic drugs; and

    e.   entering into a reverse payment agreement with Amneal to delay competition from generic QVAR.

584.     The goal, purpose, and/or effect of Teva's scheme was to maintain and extend Teva's monopoly power with respect to QVAR. Teva's illegal scheme to prevent, delay, and/or minimize the success of the introduction into the United States marketplace of any generic versions of QVAR enabled Teva to continue charging supra-competitive prices for QVAR and QVAR Redihaler without a substantial loss of sales. If manufacturers of generic QVAR had been able to enter the market and fairly compete with Teva in a full and timely fashion, plaintiff and members of the Class would have substituted lower-priced generic QVAR for some or all of their QVAR requirements, and/or would have received lower prices on some or all of their remaining branded QVAR purchases, at earlier periods of time and in far greater quantities.

585.   As a result of Teva's illegal scheme, plaintiff and the Class paid more than they would have paid for QVAR, absent Teva's illegal conduct. But for Teva's illegal conduct, competitors would have begun marketing generic versions of QVAR well before they actually did, and/or would have marketed such versions more successfully than they actually did.

586.   During the relevant period, plaintiff and members of the Class purchased substantial amounts of QVAR directly from Teva. As a result of Teva's illegal conduct, alleged herein, plaintiff and the members of the Class were compelled to pay, and did pay, artificially inflated prices for their QVAR requirements. Plaintiff and all other Class members paid prices for QVAR that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (a) class members were deprived of the opportunity to purchase lower-priced generic QVAR instead of expensive brand-name QVAR and QVAR Redihaler; and/or (b) the price of branded QVAR was artificially inflated by Teva's illegal conduct.

587.   Teva's scheme was in the aggregate an act of monopolization undertaken with the specific intent to monopolize the market for QVAR in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## SECOND CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Agreement Not to Compete with Brand And Generic QVAR Between Teva and Amneal
### *Against all defendants*

588.   The plaintiff incorporates by reference the preceding allegations.

589.   Teva and Amneal have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

590.   Teva and Amneal entered into an illegal contract, combination and conspiracy in

restraint of trade under which Teva agreed to make a large reverse payment to Amneal in exchange for Amneal's agreement to delay bringing generic QVAR to the market. The purpose and effect of this reverse-payment agreement was to: (a) allocate to Teva 100% of the U.S. sales of QVAR products; (b) delay the availability of generic QVAR products in the United States, thereby protecting QVAR from any generic competition; and (c) fix and maintain, at supracompetitive levels, the price plaintiff and class members paid for QVAR products.

591.    The Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

592.    The Teva-Amneal reverse-payment agreement was unlawful and the reverse payment was large and unjustified.

593.    The Teva-Amneal reverse-payment agreement harmed plaintiff and the class as set forth above.

594.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payment from Teva to Amneal that outweighs its harmful effect. Even if there were some conceivable such justification, the payment was not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

595.    As a direct, proximate, foreseeable, and intended result of the Teva-Amneal reverse-payment agreement in restraint of trade, as alleged herein, plaintiff and the class were harmed and suffered overcharge damages. Specifically, without a reverse payment, Amneal would have launched its generic version of QVAR and plaintiff and members of the class would have paid less.

## XII.   JURY DEMAND

596.    The plaintiff, on behalf of itself and the class, demands a jury trial on all issues triable of right before a jury.

111

## XIII.   PRAYER FOR RELIEF

The plaintiff requests that the Court enter judgment in their favor and grant the following relief:

A.      The Court determine that this action may be maintained as a class action pursuant to Rule 23(a), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Procedure, be given to the Class;

B.      The acts alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 2 of the Sherman Act;

C.      Each member of the Class recover three-fold the damages determined to have been sustained by each of them, and that joint and several judgment be entered against Defendants in favor of the Class; and

D.      The Class recover their costs of suit, including reasonable attorneys' fees as provided by law.

Dated: May 16, 2024                    Respectfully submitted,

                                       **SILVER GOLUB & TEITELL LLP**

                                       By: /s/ *Sean K. McElligott*

                                           Sean K. McElligott (Mass. BBO #651710)
                                           Steven L. Bloch (pro hac vice forthcoming)
                                           Ian W. Sloss (pro hac vice forthcoming)
                                           Jonathan Seredynski (pro hac vice forthcoming)
                                           **SILVER GOLUB & TEITELL LLP**
                                           1 Landmark Sq. – 15th Floor
                                           Stamford, Connecticut 06901
                                           Telephone: (203) 325-4491

Facsimile: (203) 325-3769
smcelligott@sgtlaw.com
sbloch@sgtlaw.com
isloss@sgtlaw.com
jseredynski@sgtlaw.com

Bruce E. Gerstein
Dan Litvin
**GARWIN GERSTEIN & FISHER LLP**
88 Pine Street, 10th Floor
New York, NY 10005
(212) 398-0055
bgerstein@garwingerstein.com
dlitvin@garwingerstein.com

David F. Sorensen
Caitlin G. Coslett
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000
dsorensen@bm.net
ccoslett@bm.net

Stuart E. Des Roches
Andrew W. Kelly
**ODOM & DES ROCHES, LLC**
650 Poydras Street, Suite 2020
New Orleans, LA 70130
(504) 522-0077
stuart@odrlaw.com
akelly@odrlaw.com

Susan Segura
David C. Raphael, Jr.
Erin R. Leger
**SMITH SEGURA RAPHAEL & LEGER, LLP**
221 Ansley Blvd.
Alexandria, LA 71303
(318) 445-4480
ssegura@ssrllp.com
draphael@ssrllp.com
eleger@ssrllp.com

Russell Chorush
**HEIM PAYNE & CHORUSH, LLP**

1111 Bagby, Suite 2100
Houston, TX 77002
(713) 221-2000
rchorush@hpcllp.com

*Attorneys for Value Drug Company*

APPENDIX A: Orange Book Listings for QVAR Redihaler

| Patent No. | Title | Issue Date | Listing Date | Expiry | Claims beclomethasone dipropionate drug product? |
|---|---|---|---|---|---|
| 6,446,627 | *Inhaler Dose Counter* | 9/10/2002 | 8/2017 | 12/18/2017 | No |
| 7,637,260 | *Medicament dispensing device with a multimaterial diaphragm bounding a pneumatic force chamber* | 12/29/2009 | 8/2017 | 11/2/2022 | No |
| 8,132,712 | *Metered-dose inhaler* | 3/13/2012 | 8/2017 | 9/7/2028 | No |
| 8,931,476 | *Inhaler* | 1/13/2015 | 8/2017 | 7/17/2031 | No[24] |
| 10,022,509 | *Dose counter for inhaler having a bore and shaft arrangement* | 7/17/2018 | 7/2018 | 5/18/2031 | No |
| 10,022,510 | *Dose counters for inhalers, inhalers and methods of assembly thereof* | 7/17/2018 | 7/2018 | 5/18/2031 | No |
| 10,086,156 | *Dose counter for inhaler and method for counting doses* | 10/2/2018 | 10/2018 | 5/18/2031 | No |
| 10,695,512 | *Dose counter for inhaler having an anti-reverse rotation actuator* | 6/30/2020 | 7/2020 | 3/15/2032 | No |
| 10,792,447 | *Breath actuated inhaler* | 10/6/2020 | 10/2020 | 1/25/2039 | Yes |
| 11,395,888 | *Inhalers and related methods* | 7/26/2022 | 8/2022 | 1/26/2038 | Yes |
| 11,395,889 | *Dose counter for inhaler having an anti-reverse rotation actuator* | 7/26/2022 | 8/2022 | 5/18/2031 | No |
| 11,559,637 | *Inhalers and related methods* | 1/24/2023 | 2/2023 | 7/21/2039 | No[25] |
| 11,583,643 | *Inhalers and related methods* | 2/21/2023 | 3/2023 | 8/19/2041 | No[24] |

---

[24] Dependent claim 15 of the '476 patent reads "An inhaler according to claim 1, wherein the medicament is selected from the group consisting . . . *beclomethasone*" and other molecules. Beclomethasone is not the same as beclomethasone dipropionate.

[25] The '637 and '643 patents include only method-of-use claims, some of which include, as an element a method of using an inhaler containing beclomethasone dipropionate.

APPENDIX B: Orange Book Listings for QVAR

| Patent No. | Title | Issue Date | Listing Date | Expiry | Claims a beclomethasone dipropionate drug product? |
|---|---|---|---|---|---|
| 5,605,674 | *Medicinal aerosol formulations* | 2/25/1997 | 10/2000 | 2/25/2014 | No |
| 5,683,677 | *Medicinal aerosol formulations* | 11/4/1997 | 10/2000 | 11/4/2014 | No |
| 5,695,743 | *Medicinal aerosol formulations* | 12/9/1997 | 10/2000 | 7/6/2010 | Yes |
| 5,766,573 | *Medicinal aerosol formulations* | 6/16/1998 | 10/2000 | 11/28/2009 | Yes |
| 5,776,432 | *Beclomethasone solution aerosol formulations* | 7/7/1998 | 10/2000 | 7/7/2015 | Yes |
| 6,446,627 | *Inhaler dose counter* | 9/10/2002 | 6/2014 | 12/18/2017 | No |
| 9,463,289 | *Dose counters for inhalers, inhalers and methods of assembly thereof* | 10/11/2016 | 11/2016 | 5/18/2031 | No |
| 9,808,587 | *Dose counter for inhaler having an anti-reverse rotation actuator* | 11/7/2017 | 11/2017 | 5/18/2031 | No |
| 10,022,509 | *Dose counter for inhaler having a bore and shaft arrangement[26]* | 7/17/2018 | 7/2018 | 5/18/2031 | No |
| 10,022,510 | *Dose counters for inhalers, inhalers and methods of assembly thereof* | 7/17/2018 | 7/2018 | 5/18/2031 | No |
| 10,086,156 | *Dose counter for inhaler and method for counting doses* | 10/2/2018 | 10/2018 | 5/18/2031 | No |
| 10,561,808 | *Dose counter for inhaler having an anti-reverse rotation actuator* | 2/18/2020 | 3/2020 | 12/22/2031 | No |
| 10,695,512 | *Dose counter for inhaler having an anti-reverse rotation actuator* | 6/30/2020 | 7/2020 | 3/15/2032 | No |

---

[26] Teva listed the patents in blue font after it announced it was discontinuing its QVAR product.

| Patent No. | Title | Issue Date | Listing Date | Expiry | Claims a beclomethasone dipropionate drug product? |
|---|---|---|---|---|---|
| 11,395,889 | *Dose counter for inhaler having an anti-reverse rotation actuator* | 7/26/2022 | 8/2022 | 5/18/2031 | No |